STATE OF FLORIDA, and P. H. ARTHUR, intervenor, v. CITY OF MIAMI, a Municipal Corporation of the State of FLORIDA.

7 So. (2nd) 146                                             En Banc
March 28, 1942

George A. Worley, Jr., and George C. Simpson, for appellants.

J. W. Watson, Jr., and Masslich and Mitchell (of 120 Broadway, New York City) for appellee.

BUFORD, J.:

On appeal we review an order of the circuit court validating the City of Miami Hospital Revenue Bonds in the sum of $1,157,000.00.

The pertinent facts found from the evidence and the applicable legal principles are concisely stated in the decree from which the appeal is taken, as follows:

"This cause coming on to be heard on the 24th day

of February, 1942, at the hour of 10:00 o'clock A.M. of said day, at the Circuit Court Room in the Court House in the City of Miami, in the County of Dade in said Circuit upon the petition of said City of Miami (hereinafter sometimes called the 'City'), for the validation of $1,157,000.00 Hospital Revenue Bonds of said City of Miami, pursuant to an order heretofore issued by this Court against the State of Florida, requiring it, through its State Attorney for the Eleventh Judicial Circuit of Florida, to show cause at said time and place why the said Hospital Revenue Bonds should not be validated and confirmed as was prayed in such Petition, and it appearing that copies of said Order and Petition were served upon said State Attorney, as is required by law, and that notice of said hearing directed to the taxpayers and citizens of said City of Miami was published as is required by law, and it further appearing that said State Attorney has filed an Answer as required by law, and that a taxpayer, one P. H. Arthur, has intervened and has filed an Answer to said Petition, and evidence having been introduced and the cause submitted for consideration and decision, the Court having heard and determined all of the questions of law and of fact in the cause, finds the facts as follows:

"(1). All of the material allegations in said Petition for Validation are true, and the issuance of said $1,157,000. Hospital Revenue Bonds has been duly authorized by Resolution No. 17659, passed and adopted by the City Commission of the City of Miami on January 30, 1942.

"(2). The City owns and operates a municipal hospital in the City of Miami (now known as the Jackson Memorial Hospital and hereinafter sometimes called

the 'municipal hospital'), which hospital was constructed in the year 1916 and has at all times since its construction provided accommodations, services and facilities for the treatment not only of patients able to pay for all or a part of the services rendered and treatment received (hereinafter sometimes called 'Pay patients') but also of patients unable to pay for any of such services and treatments (hereinafter sometimes called 'charity patients'), and in order to meet increasing demands for hospital services and facilities since 1916 the City has from time to time improved and extended the municipal hospital.

"(3)   For the purpose of paying the cost of constructing the municipal hospital and of improving and extending the same from time to time, the City issued prior to April 1, 1935, its general obligation bonds, payable from unlimited ad valorem taxes in the aggregate amount of $694,000, and the City has heretofore expended for such purpose from the general funds of the City amounts aggregating $236,000, and, for the purpose of further extending the municipal hospital, the City issued, under date of April 1, 1935, its hospital revenue certificates, payable solely from the net revenue of the municipal hospital, in the aggregate principal amount of $236,000 and secured a grant from the United States of America in the aggregate amount of $114,000.

"(4).   The facilities of the municipal hospital have been severely overtaxed for several years by the normal requirements of the City and of the County of Dade, and the need for additional hospital services and facilities has been greatly increased in recent months, and such additional hospital services and facilities have also become necessary in order to assume

adequate safeguards and facilities for defense operations.

"(5). The construction of extensions to the municipal hospital is necessary to continue the efficient operation and maintenance of the municipal hospital, to meet the constantly increasing demands for hospital services and treatment, to enlarge the usefulness of the existing hospital facilities, and to preserve the property, health and safety of the inhabitants of the City.

"(6). The execution of an agreement (hereinafter sometimes called the 'Agreement') between the City and the County of Dade (hereinafter sometimes called the 'County') in the form appended as 'Exhibit A' to Resolution No. 17659 hereinafter mentioned, has been duly authorized by the City Commission of the City of Miami (hereinafter sometimes called the 'Commission') and by the Board of County Commissioners of the County, under the provisions of which Agreement the City and the County agree in part as follows:

"The County will convey to the City by a good and sufficient deed of warranty, free and clear of all liens and encumbrances, the fee simple title to the plat of land now owned by the County, which is in close proximity to the municipal hospital, lying and being in the City of Miami and described as follows:

"The northwest quarter of the northeast quarter of the southeast quarter of Section 26, Township 53 South, Range 41 East, excepting therefrom the following strip of land: The west twenty-five feet, the east twenty-five feet and the north thirty-five feet.

"The City will construct thereon extensions to the municipal hospital, such extensions (hereinafter sometimes collectively called the 'extensions') to consist

of: a fireproof five-story building to provide the equivalent of 300 hospital beds, completely equipped and furnished, including medical and surgical facilities, furniture for patients' rooms, halls and corridors, medical and surgical equipment, X-Ray equipment, kitchens, diet kitchens, and dining room equipment, a separate two-story nurses' dormitory, completely equipped and furnished, an emergency power plant, and grading, landscaping and construction of necessary roads, walkways and parking areas.

"The City leases to the County all of the extensions to the municipal hospital for a period of twenty-five years commencing on the first day of the month immediately following the date of completion of construction of the buildings described above, and the County agrees to pay to the City as rent therefor the sum of $70,000 annually, payable in advance in quarterly installments of $17,500, on or before the first days of January, April, July and October in each year during the term of such lease; all moneys payable by the County to the City as rent under the provisions of this Agreement will be deposited by the County with such depositary as may be designated by the City; the County agrees to appropriate each year in its annual budget the amount required for making such quarterly payments; the obligation of the County to pay such rent to the City will cease and terminate on the first day of the month following the time when the principal of and the interest on all the hospital revenue bonds issued by the City to finance such extensions shall have been paid or sufficient moneys shall have been made available for the payment of such principal and interest, and the County agrees to manage, operate and maintain the extensions during the term of such

lease. From and after the time when the extensions shall have been completed and opened for use and occupancy, the municipal hospital will be used primarily for the purpose of furnishing medical care and treatment to pay patients and the extensions will be used primarily for the purpose of furnishing medical care and treatment to charity patients, but both the municipal hospital and the extensions will be available to care for casualties or illness resulting from naval or military hostilities in the southeast Florida region or the Caribbean area, an epidemic of tropical disease in such area where naval or military bases are located, or a tropical storm in such region or area, and the County agrees that it will at all times provide, to the extent that funds for such purposes may lawfully be made available, adequate hospital facilities and furnish such medical care and treatment as may be necessary for charity patients residing in the City. Inasmuch as the City of Miami contains approximately 65% of the total population of the County of Dade, but contains only approximately 45% of the assessed value of real property in the County which is assessed for County purposes, the City should, in fairness and equity, bear an additional burden by contributing annually to the cost of charity patients who will use the extensions, and the City and the County have found and determined that the fair and reasonable amount of such additional burden which should be borne by the City is the sum of $72,000 annually, and the City agrees to pay such sum of $72,000 annually to the County for such purpose in monthly installments of $6,000 on the first day of each and every month commencing on the first day of the month immediately following the date of completion of construction of the

buildings described above, and the City will appropriate each year in its annual budget the amount required for making such payment. The City agrees to convey to the County a fee simple title to the extensions, free and clear of all liens and encumbrances, as soon as the principal of and the interest on all of the hospital revenue bonds referred to above shall have been paid or provisions made for such payment, and in consideration of such conveyance the City shall thereafter be relieved of its obligation to make the monthly payments required to be made by it under the foregoing provisions of this paragraph.

"(7). The cost to the City of furnishing services and treatment to charity patients at the municipal hospital in the last ten fiscal years has been as follows:

| "Year | Amount |
|---|---|
| 1931-32 | $173,274.46 |
| 1932-33 | 208,502.39 |
| 1933-34 | 204,240.51 |
| 1934-35 | 200,506.51 |
| 1935-36 | 187,256.95 |
| 1936-37 | 253,048.48 |
| 1937-38 | 226,730.61 |
| 1938-39 | 222,437.00 |
| 1939-40 | 228,641.27 |
| 1940-41 | 299,540.29 |

"And the execution of the above mentioned Agreement will thereby result in enormous annual savings to the City for furnishing services and treatment to charity patients.

"The annual revenues of the City are more than sufficient to pay current operating expenses of the City and to make the payments which are required to be

made by the City under the provisions of the Agreement. And the annual revenues of the County are more than sufficient to pay current operating expenses of the County and to make the payments which are required to be made by the County under the provisions of the Agreement.

"(8). The City has agreed with the owners of the outstanding hospital revenue certificates to acquire the same for retirement (excluding the certificates which mature on April 1, 1942, and for the payment of which funds are now available), such certificates to be retired consisting of $207,000 Hospital Revenue Certificates, dated April 1, 1935, and maturing in annual installments on the first day of April in the years 1943 to 1965, inclusive, all bearing interest at the rate of four per centum (4%) per annum (herein sometimes called the 'outstanding hospital revenue certificates').

"(9). The Federal Works Agency has agreed to aid in financing the construction of such extensions by making a grant to the City in the sum of Three Hundred Thousand Dollars ($300,000).

"(10) Under the authority of Chapters 19980 and 19982, Special Laws of Florida, 1939, (hereinafter sometimes called the 'Revenue Bond Acts'), on January 30, 1942, the Commission duly passed and adopted Resolution No. 17659 (hereinafter sometimes called the 'Resolution'), a copy of which Resolution is attached to the Petition for Validation, marked 'Exhibit 1,' and made a part thereof, providing for the construction by the City of the extensions to the municipal hospital and providing for the issuance of Hospital Revenue Bonds of the City, payable solely from

hospital revenues, in the following amounts and for the following purposes:

"(a)   $207,000 for the purpose of refunding the outstanding Hospital Revenue Certificates, and

"(b)   $950,000 for the purpose of paying a part of the cost of constructing the extensions.

"11.   Said Resolution No. 17659 sets forth the terms and conditions under which said Hospital Revenue Bonds may be issued, provides for the fixing and collecting of rates and charges for the services and facilities furnished by the Municipal Hospital and provides for the disposition to be made of the rentals of the extensions, and sets forth the rights and remedies of the holders of said Hospital Revenue Bonds; said Resolution provides for the deposit and for the application of the proceeds of the bonds; and the City covenants in said Resolution that it will continue in effect and charge the present schedule of fees and charges for the services and facilities furnished to pay patients at the municipal hospital and that from time to time and as often as it shall appear necessary it will adjust such fees and charges as may be necessary or proper, so that the fees and charges collected, together with the rentals of the extensions, will be sufficient to provide funds for paying all expenses of maintaining, repairing and operating the municipal hospital and for paying the principal of and the interest on the bonds as the same becomes due and payable, including reserves for such purposes; all fees and charges arising from the operation of the municipal hospital are to be deposited as received in the name of the City to the credit of a special fund designated the 'Municipal Hospital Revenue Fund'; all moneys deposited to the credit of the Municipal Hospital Rev-

enue Fund are to be held in trust and applied as provided in said Resolution, including the deposits to the credit of a special fund designated the 'Municipal Hospital Sinking Fund,' of a sufficient amount of the revenues of the municipal hospital over and above such expense of maintenance, repair and operation, together with the rentals of the extensions, to pay the principal of and the interest on the bonds as the same become due and payable and to create a reserve for such purpose, which special fund is by said Resolution pledged to and charged with the payment of the principal of and the interest on the bonds.

"(12). The formula provided by Section 403 of Article IV of said Resolution No. 17659 properly determines the part of the expenses of operating and maintaining the municipal hospital that may be paid from revenues from pay patients and the part of such expenses that may be paid from tax funds or from funds other than revenues from pay patients.

"(13). During the last two fiscal years, the net revenues of the municipal hospital, over and above the cost of maintenance, repair and operation, have been as follows:

| "Fiscal Years* | Net Revenues |
|---|---|
| 1939-40 | $46,805.86 |
| 1940-41 | 57,728.40 |

Taking into account the foregoing net revenues of the municipal hospital and the rentals to be paid by the County for the extensions, the funds available for such purpose will be more than sufficient to pay the principal of and the interest on the bonds to be issued under the provisions of said Resolution No. 17659 as the same become due and payable and to provide adequate reserves for such purposes.

"As Conclusions of Law from the foregoing facts, the Court finds:

"(1). Chapters 19980 and 19982, Special Laws of Florida, 1939, and the Charter of the City of Miami (Chapter 10847), Special Laws of Florida, 1925, as heretofore amended and supplemented) fully authorize the City to construct the extensions to the municipal hospital above described, and to issue said $1,157,000 Hospital Revenue Bonds of the City in the form and manner provided by said Resolution No. 17659 and under and in accordance with the terms and provisions of said Resolution, for the purpose of paying all or a part of the cost of such construction and for the purpose of refunding the outstanding hospital revenue certificates, and to fix, charge and collect rates, rentals and charges for the services and facilities furnished by the municipal hospital and by such extensions as covenanted in said Resolution.

"(2) The execution of the Agreement between the County and the City is fully authorized by law and none of its provisions will be in violation of the provisions of amended Section 6 of Article IX of the Florida Constitution. The City is fully authorized to execute such Agreement by the provisions of the Revenue Bond Acts and of the City Charter. The County is fully authorized to execute such Agreement by the provisions of Chapter 20476, General Laws of Florida, 1941, and by the mandate contained in Section 3 of Article XIII of the Florida Constitution to provide for charity patients in the County, and such mandate is entirely independent of and unaffected by the provisions of amended Section 6 of Article IX of the Florida Constitution. And all of the terms and pro-

visions of said Agreement are in all respects validated and confirmed.

"(3) The provisions and covenants of said Resolution Number 17659 are in accordance with law, and without in any manner limiting approval of said Resolution to any particular provision or covenant thereof, all of the provisions of said Resolution relating to the details of said Hospital Revenue Bonds, the provisions for the redemption thereof at a premium, the provisions relating to the deposit of the proceeds of said bonds, the application to be made thereof, and the covenants relating to the rates and charges for the services and facilities to be furnished by the municipal hospital and relating to the rentals of the extensions, are fully authorized by said Chapters 19980 and 19982, and are hereby in all respects ratified and confirmed, and all of the terms, covenants and provisions of said Resolution are in all respects validated and confirmed.

"(4). The formula provided by Section 403 of Article IV of said Resolution No. 17659 does not provide for an unconstitutional diversion or use of tax moneys toward payment of an improper share of the expenses of operating and maintaining the municipal hospital.

"(5) Said $1,157,000 City of Miami Hospital Revenue Bonds will not be bonds in the constitutional sense or within the contemplation of the provisions of Section 6 of Article IX of the Constitution of the State of Florida, as amended.

"(6). Said $1,157,000 City of Miami Hospital Revenue Bonds will not constitute a debt of the City of Miami or a pledge of the faith and credit of the City, but will be payable exclusively from a special fund provided therefor from revenues of the municipal hospital and of the extensions, and the issuance of the

bonds will not directly or indirectly or contingently obligate the City to levy or pledge any form of taxation whatever for their payment, or to make any appropriation therefor, and the City will have no power to levy or to pledge any form of taxation whatever for the payment of the principal of or the interest on said bonds.

"(7). The Commission is fully authorized by said Chapters 19980 and 19982, Special Laws of Florida, 1939, to sell said $1,157,000 Hospital Revenue Bonds at public or private sale as the Commission may deem advisable in the exercise of its powers and discretion."

Two questions are submitted for our consideration, as follows:

"Will the issuance of the $1,157,000 Hospital Revenue Bonds of the City of Miami, which are payable solely from the net income of the municipal hospital of the City as extended and do not directly or indirectly pledge the taxing power of the City and which are to be issued without the approval of a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in the City of Miami shall have participated, violate the provisions of amended Section 6 of Article IX of the Florida Constitution?

"2. Does the Agreement which has been entered into between the City of Miami and the County of Dade violate the provisions of amended Section 6 of Article IX of the Florida Constitution, and is such Agreement authorized by law?"

The first question must be resolved against the contention of the appellant on authority of the following cases:

State v. City of Daytona Beach, 118 Fla. 29, 158

Sou. 300; Wilson v. City of Bartow, 124 Fla. 356, 168 Sou. 545; State v. City of Clearwater, 124 Fla. 354, 168 Sou. 546; Boykin v. Town of River Junction, 124 Fla. 827, 169 Sou. 492; Williams v. Town of Dunnellon, 125 Fla. 114, 169 Sou. 631; State v. City of Fort Pierce, 126 Fla. 184, 170 Sou. 742; Brooks v. City of Jacksonville, 127 Fla. 564, 173 Sou. 365; Hess v. City of Orlando, 133 Fla. 831, 183 Sou. 473; State v. City of Pensacola, 135 Fla. 239, 184 Sou. 768; State v. City of Wauchula, 137 Fla. 374, 188 Sou. 365.

And also Roach v. City of Tampa, 125 Fla. 62, 169 Sou. 627; Blocker v. City of St. Petersburg, 125 Fla. 156, 169 Sou. 647; State v. City of Fort Lauderdale, 149 Fla. 177, 5 Sou. (2nd) 263.

The second question must be resolved against the contention of the appellant on authority of the opinion and judgment in the case of Leon County v. State, 122 Fla. 55, 165 Sou. 666, and cases there cited. See also Lott v. City of Orlando, 142 Fla. 338, 196 Sou. 313.

It has been generally held that contracts for the payment of current county or municipal expenses do not come within the constitutional or statutory prohibition against the incurring of county or municipal indebtedness whether such contracts run for a period of one year or for several years provided the revenues which will be available annually to the county or municipality are found to be sufficient to meet the current expenses including amounts to become due under such contract. See Leon County v. State, supra; Hathaway v. Monroe, 97 Fla. 28, 119 Sou. 149; Tapers v. Pichard, 124 Fla. 549, 169 Sou. 39; Posey v. Wakulla County, 148 Fla. 115, 3 Sou. (2nd) 799. For authorities beyond this jurisdiction involving this question, see the following:

Walla Walla v. Walla Walla Water Co., 172 U. S. 1; Heberer v. Board of Commissioners of Chafee County, 293 Pac. 349; City of South Bend v. Reynolds, 155 Ind. 70, 57 N.E. 706; Grant v. City of Davenport, 36 Iowa 396; Laycock v. Baton Rouge, 35 La. Ann. 475; Wade v. Oak-Mont Borough, 165 Pa. 479, 30 Atl. 959; Smith v. Dedham, 144 Mass. 177, 10 N.E. 782; Webb City Waterworks Co. v. Carterville, 153 Mo. 128, 54 S.W. 557; Doland v. Clark, 143 Cal. 176, 76 Pac. 958; Raton Water Works Co. v. Raton, 9 N.M. 70, 49 Pac. 898; Tyler v. Jester, 97 Tex. 344, 78 S.W. 1058; Allison v. Chester, 69 W. Va. 533, 72 S. E. 472; Herman v. Oconto, 110 Wis. 660, 86 N.W. 681; Jefferson County v. State, 233 Ala. 148, 170 So. 70.

No reversible error being disclosed by the record, the decree should be and is affirmed.

So ordered.

Affirmed.

BROWN, C. J., WHITFIELD, TERRELL, CHAPMAN and THOMAS, JJ., concur.