# Richmond

Board of Supervisors of Fairfax County v. Carlton C. Massey, County Executive of Fairfax County.

City of Falls Church v. Harry E. Wells, City Manager of the City of Falls Church.

April 27, 1970.

Record Nos. 7377 and 7378.

Present, All the Justices.

*Harry Frazier, III* (*Donald C. Stevens, County Attorney; Jack Spain, Jr.; Hunton, Williams, Gay, Powell & Gibson,* on brief), for petitioners in Record No. 7377.

*Harry Frazier, III* (*LaRue Van Meter, City Attorney; Jack Spain, Jr.; Hunton, Williams, Gay, Powell & Gibson,* on brief, for petitioner in Record No. 7378.

*Dexter S. Odin* (*Farley, Odin, & Feldman,* on brief), in respondent in Record Nos. 7377 and 7378.

*Jerome A. Alper* (D.C.) (*John R. Kennedy* (D.C.); *Robert E. Ferdon* (N.Y.); *Peter A. Greenburg; Bernstein, Alper, Schoene & Friedman* (D.C.), on brief), *amicus curiae* for Washington Area Transit Authority in Record Nos. 7377 and 7378.

ANSON, J., delivered the opinion of the court.

As a sequel to our decision in *Fairfax County* v. *County Executive*, 210 Va. 253, 169 S.E.2d 556 (1969), holding that the obligations undertaken by the agreements of Fairfax County and the City of Falls Church with the Washington Metropolitan Transit Authority to underwrite their proportionate shares of the deficits incurred in operating expenses of the Authority's proposed public transit system constituted debt or indebtedness within the meaning of §§ 115(a) and 127 of the Constitution of Virginia and the charter provisions of the City, the Authority made basic changes in its plans for financing the transit system and has submitted new agreements which the Board of Supervisors of the County and the Council of the City have adopted.

The new agreements provide that the County and City will make transit service payments to the Authority based on the number of train miles operated within the County and the City and the number of their residents using the system. The respondents, Carlton C. Massey, County Executive, and Harry E. Wells, City Manager, have refused to execute the new agreements, and the County and City are here under the original jurisdiction of this court upon separate petitions for writs of mandamus to compel the County Executive and the City Manager to execute the new agreements on behalf of their respective County and City.

The legislative background, the mass transit plan, and the original financial plan for the construction and operation of the transit system are set out in *Fairfax County* v. *County Executive, supra,* and need not be repeated here.

The Authority's new financial plan eliminates the requirements of the original plan that the County and City underwrite their proportionate shares of the deficits incurred in operating the transit system. The new agreements provide that in consideration of the transit service to be provided by the Authority, the County and City shall pay to the Authority annually, beginning in the first year of full operation of the transit system (estimated to be 1980) the sum of:

"(i) an amount equal to 1¼ cents for each Transit Trip by a resident of the County [or City] during such Fiscal Year, as determined by the Authority in accordance with Section 3.2, plus

"(ii) an amount equal to twenty cents for each Train Mile within the County [or City] during such Fiscal Year, as determined by the Authority in accordance with Section 3.3."

The number of transit trips is based on surveys of the ridership of the system which are required to be made annually in accordance with certain designated procedures approved by the Authority. A transit trip is defined as the use of the system by a resident of a political subdivision to travel from one place in the zone to another. (The zone encompasses the District of Columbia; the counties of Arlington and Fairfax, and the cities of Alexandria, Falls Church and Fairfax, in Virginia; and Montgomery and Prince George's counties in Maryland.) The number of train miles is based on the Authority's records. Train miles are defined as the total number of miles traveled in revenue service by all trains of the system during a fiscal year within the boundaries of a political subdivision. Thus the obligations of the County and City are dependent upon the furnishing of transit service.

The estimated cost of construction of the transit system and the amounts to be obtained by grants or contributions are the same as under the Authority's original financial plan. The Authority, however, will issue net revenue bonds in the amount of $880,000,000, an increase of $45,000,000, to fund the initial part of a bond reserve, the balance of which is to be funded from transit service revenues.

The sole inquiry here is whether the County and the City will incur a debt or indebtedness in violation of §§ 115(a) and 127 of the Constitution of Virginia by executing the new agreements.

The pertinent provisions of § 115(a) of the Constitution are:

"No debt shall be contracted by any county * * * except in pursuance of authority conferred by the General Assembly by general law; and the General Assembly shall not authorize any county * * * to contract any debt except to meet casual deficits in the revenue, a debt created in anticipation of the collection of the revenue of the said county * * * for the then current year, or to redeem a previous liability, unless in the general law authorizing the same provision be made for the submission to the qualified voters of the proper county * * * for approval or rejection, by a majority vote of the qualified voters voting in an election, on the question of contracting such debt; and such approval shall be a prerequisite to contracting such debt * * *."

The pertinent provisions of § 127 of the Constitution are:

"No city or town shall issue any bonds or other interest-bearing

obligations for any purpose, or in any manner, to an amount which, including existing indebtedness, shall, at any time, exceed eighteen per centum of the assessed valuation of the real estate in the city or town subject to taxation, as shown by the last preceding assessment for taxes * * *."

Petitioners argue that since the new agreements provide for payment of annual charges for transit service actually rendered, the obligations assumed by the County and City do not constitute debt or indebtedness within the meaning of § 115(a) or § 127.

In *Fairfax County* v. *County Executive, supra,* 210 Va. at 260, 169 S.E.2d at 561, we recognized a rule respecting service contracts, "that a continuing service contract, for which the municipality agrees to pay in installments as the service is furnished, does not create a present debt for the aggregate amount of all the installments throughout the term of the contract within the meaning of constitutional limitations of municipal indebtedness." *See* cases collected in Annot. 103 A.L.R. 1160 (1936); 15 McQuillin, Municipal Corporations, § 41.37 at 388 (3d Ed. 1970). So this court has recognized the peculiar nature of service contracts.

The service contract rule is not limited in its application to municipalities. It has also been applied to a service contract entered into by a county. *Appalachian Elec. Power Co.* v. *State Road Commission of West Virginia,* 117 W.Va. 200, 203, 185 S.E. 223, 225 (1936).

Respondents argue, however, that the stated rule can save only the City's case, governed by § 127 of the Constitution, and not the County's case, governed by § 115(a). They say that if the aggregate amount of all installments under the City's contract is not counted, the City may be able to bring itself within the permissible debt limit of § 127, eighteen percent of the assessed value of real estate in the City. But if the County's contract creates any debt, present or future, the contract violates § 115(a). Under § 115(a) a county cannot, without approval of the voters (which has not been obtained) contract indebtedness in *any* amount except (1) debt to meet a casual deficit in the revenue, (2) debt created in anticipation of collection of the revenue for the current year, or (3) debt to redeem a previous liability.

However, the rule that arises out of the peculiar nature of service contracts does save such contracts from invalidity under § 115(a) as well as § 127. This rule recognizes that a commitment for services to be paid for only after the services are rendered is *not* a commitment

for debt or indebtedness within the meaning of constitutional limitations or prohibitions. Rather this commitment is to honor each year the account payable incurred for services rendered that year.

In *American-LaFrance* v. *Arlington County*, 164 Va. 1, 9, 178 S.E. 783, 786 (1935), the county gave the manufacturer of fire engines its notes payable over three years for the unpaid balance of the purchase price of fire fighting apparatus and equipment. We held that the installment purchase created an absolute and unconditional obligation in clear violation of § 115(a), and that an approval by a majority of the citizens voting on the question "is a prerequisite to the power of the board of supervisors to create an obligation for any purpose, *payable at some future time beyond the termination of the current fiscal year*." (Emphasis added.)

Obviously in *American-LaFrance* we were not dealing with a service contract where payments are made annually as the service is rendered. As pointed out in *Barnes* v. *Lehi City*, 74 Utah 321, 343, 279 P. 878, 886 (1929), "such contracts [service contracts], being for services to be paid for periodically, are merely arrangements to pay for current expenses as they are incurred." Or, as said by the Massachusetts court: "[A service contract] is in effect a cash transaction, where the payments are made *pari passu* with the accumulation of the yearly service which determines the amount to be paid." *Smith* v. *Town of Dedham*, 144 Mass. 177, 180, 10 N. E. 782, 787 (1887).

The question before us, then, is whether the new agreements may be properly characterized as contracts for continuing services to the County and City, falling within the rule or doctrine relating to service contracts.

The service contract doctrine had its genesis many years ago in contracts of municipalities with private companies to furnish water and electricity. With the growth of population, the need of urban areas for increased services, and the broadened concept of responsibility of local governments to provide community services, the service contract doctrine has been applied to a variety of municipal services other than to water and electricity. For example: *Meier* v. *City of Madison*, 257 Wis. 174, 182, 42 N.W. 2d 914, 918 (1950), involved a forty-year contract between the city and a hospital association requiring the city to pay the hospital $75,000 annually to care for indigents. For a similar agreement, see *State* v. *City of Miami*, 150 Fla. 270, 276-77, 281, 7 S.2d 146, 149, 151 (1942). In *Macon Ambulance Service, Inc.* v. *Snow Properties, Inc.*, 218 Ga. 262, 270,

127 S.E.2d 598, 603 (1962), a private ambulance company entered into a contract with a hospital commission created by city charter to provide ambulance service for the city's indigent patients. In *Toomey* v. *City of Bridgeport*, 79 Conn. 229, 64 A. 215 (1906), the city contracted with a private party to remove garbage from dwellings within the city. In *Hall* v. *City of Baltimore*, 252 Md. 416, 424-25, 250 A.2d 233, 238-39 (1969), there was a lease and lease-back arrangement with the city for the construction and use of a building.

The General Assembly of Virginia declared, in Acts of 1966, Ch. 2, p. 6, that a decade of studies has established that a regional system of improved and expanded transit facilities is essential to alleviate the present and future traffic congestion in all parts of the area comprising the District of Columbia and parts of Maryland and northern Virginia.

More specifically, the General Assembly authorized the County and City to enter into contracts with the Authority for financial participation in the construction and operation of the transit system. Section 15.1-1359, Code of 1950, 1964 Repl. Vol., as amended.

The record in the present case shows that the agreements of the County and City with the Authority are for an essential public service for the benefit of their residents; that the obligations of the County and City to pay for the transit service are conditioned upon the service being rendered; and that their obligations are to pay over a period of years in periodic annual installments as service is rendered.

We hold that the new transit service agreements of the County and City with the Authority meet all the criteria of the service contract doctrine. The agreements of the County and City to pay in yearly installments for the transit service rendered their residents during those years do not create a debt or indebtedness within the meaning of §§ 115(a) and 127 of the Constitution of Virginia.

The petitions for writs of mandamus are granted, and the writs will issue as prayed.

*Writs of mandamus awarded.*