## Richmond

ANDREW P. MILLER, ATTORNEY GENERAL OF
VIRGINIA v. ROBERT C. WATTS, JR.,
TREASURER OF VIRGINIA.

April 28, 1975.

Record No. 741041.

Present, All the Justices.

*J. Durwood Felton, III, Assistant Attorney General (Andrew
P. Miller, Attorney General; John W. Crews, Assistant Attorney
General,* on brief), for petitioner.

*Robert H. Patterson, Jr. (McGuire, Woods & Battle,* on brief),
for respondent.

Compton, J., delivered the opinion of the court.

We consider in this mandamus proceeding, filed pursuant to
Code § 8-714 by the Attorney General of Virginia,[1] whether the

---

[1] Code § 8-714 provides for mandamus as a vehicle to obtain the Court's determination
of questions respecting the proper construction or interpretation of any act of the
General Assembly which appropriates or directs the payment of money out of the State
Treasury, or respecting the constitutionality of any such act.

bonds proposed to be issued under the provisions of the "Commonwealth of Virginia Higher Educational and Medical Facilities Bond Act of 1973," Acts 1973, c. 206 at 241 (Bond Act), meet the requirements of Article X, § 9 (c), of the 1971 Constitution of Virginia (hereinafter § 9 (c)).

The facts are stipulated. The Medical College of Virginia, located in Richmond, is an institution of higher learning of the Commonwealth which offers undergraduate and graduate educational programs in the health sciences. It is the Health Sciences Division of Virginia Commonwealth University, and it includes the Medical College of Virginia Hospital (MCVH).

MCVH is composed of several distinct hospitals and related facilities such as dormitories and infirmaries. It proposes to commence a program of replacement and renovation of its physical facilities at a cost of approximately $89,700,000. The sale of the bonds in question is to finance $78,800,000 of this cost.

MCVH levies fees and other applicable charges to all patients to whom it renders medical services. Since it is a State facility, the revenues received as reimbursement for providing health services are paid into the State Treasury and are appropriated by the General Assembly as "special fund" appropriations to cover the hospital's operating costs.

Prior to July 1, 1974, MCVH "wrote off" as losses uncollectible charges to indigent and medically indigent patients. When the foregoing "special fund" appropriations were inadequate to cover all of MCVH's costs, "general fund" appropriations were made to MCVH to meet otherwise unpaid expenses.

Under the 1974 Appropriations Act, the General Assembly, instead of making "general fund" appropriations to MCVH to cover its indigent care deficits, created the "Medical College of Virginia Hospital Health Services Fund" (MCVHHS Fund) to provide for payment of such deficits. The appropriation for this purpose for the 1974-76 biennium is $25,088,595. Acts 1974, c. 681, item 380 at 1330. The State Health Department, as fiscal intermediary and subject to rules and regulations prescribed by the Governor, is directed to make payments from this appropriation to MCVH for in-patient and out-patient treatment, care, maintenance and other health related services to indigent and medically indigent persons, who are not covered by any other third-party reimbursement system. Under the procedure developed within the rules and regulations duly

promulgated by the Governor, MCVH submits documented monthly vouchers to the State Health Department stating the unpaid indigent charges. The Health Department then pays MCVH for these services on a case-by-case basis upon submission of the vouchers.

MCVH's operating revenues during the 1974-76 biennium consist entirely of the "special fund" appropriation to MCVH of its own revenues and the foregoing funds received from the MCVHHS Fund, except for incidental, charitable, and trust funds.

The Bond Act in question was enacted in 1973 after Governor Holton, pursuant to § 9 (c), certified and filed his opinion dated January 26, 1973, that the anticipated net revenues to be pledged by MCVH to the payment of the principal of and the interest on the proposed bonds "will be sufficient to meet such payments as the same become due and that the capital project otherwise complies with the requirements of" the pertinent provisions of the Constitution. This opinion was based, in part, upon the results of an economic feasibility study conducted by a management consultant firm. The consultants concluded that the project was feasible, but included in MCVH's net revenues the anticipated funds from the MCVHHS Fund.

The Bond Act authorizes the issuance and sale of the bonds in question in an aggregate principal amount not exceeding $78,800,000. It further authorizes MCVH to fix, revise, charge and collect rates, fees and charges for the use, occupation, or services of the proposed project and of any existing facilities at MCVH. The Bond Act pledges to the payment of the principal of and interest on the bonds (1) the net revenues of the proposed capital project, (2) the rates, fees and other charges derived from services rendered at the existing facilities, and (3) the full faith, credit and taxing power of the Commonwealth. It further provides for the application of monies in the General Fund of the State Treasury to the payment of annual debt service on the bonds to the extent that other available funds are not sufficient therefor.

As required by § 9 (c), the Bond Act received the affirmative vote of two-thirds of the members elected to each house of the General Assembly.

Thereafter, and following receipt of an updated economic feasibility report, Governor Godwin, on October 17, 1974,

certified and filed his opinion that the anticipated net revenues to be pledged to the payment of the principal of and interest on the bonds in question would be sufficient to meet the payments on the bonds as they become due and, further, that the project otherwise complies with the requirements of § 9 (c). This certification was conditional, however, and further provided, reflecting the conclusion in the feasibility report, that the anticipated net revenues to be pledged to the bonds would meet the requirements of § 9 (c) "*only* by including therein the fees and other charges" (emphasis supplied) payable to MCVH from the MCVHHS Fund.

Subsequently, the respondent, The Treasurer of Virginia, notified the Attorney General that he entertained doubt as to the constitutionality of the Bond Act, stating that he refused to make any payment out of the State Treasury, as contemplated by the Act, pending a determination whether the requirements of § 9 (c) have been satisfied. The present proceeding was then instituted.

In his brief, respondent addresses the following questions: Does the amount of any appropriation to reimburse MCVH for services to indigents constitute net revenues within the meaning of § 9 (c)? Since future appropriations depend upon action by the General Assembly, can any amount not yet appropriated constitute anticipated net revenues within the meaning of § 9 (c)? Does the pledging of full faith and credit of the Commonwealth for the payment of bonds issued without submission of the question to the people at an election violate § 9 of Article X of the Constitution since payment depends upon appropriations by the General Assembly?

The precise issue presented, therefore, is whether the bonds to be issued pursuant to the Bond Act meet the requirements of § 9 (c), even though the anticipated net revenues pledged to the payment of principal and interest on the bonds include monies appropriated by the General Assembly to the MCVHHS Fund and paid to MCVH for medical services rendered to indigent and medically indigent patients.

Article X, § 9, provides in pertinent part as follows:

"**State debt.** — No debt shall be contracted by or in behalf of the Commonwealth except as provided herein.

\* \* \*

"(c) Debt for certain revenue producing capital projects.

"The General Assembly may authorize the creation of debt secured by a pledge of net revenues derived from rates, fees, or other charges and the full faith and credit of the Commonwealth, and such debt shall not be included in determining the limitation on general obligation debt for capital projects as permitted elsewhere in this Article, provided that

"(1) the creation of such debt is authorized by the affirmative vote of two-thirds of the members elected to each house of the General Assembly; and

"(2) such debt is created for specific revenue producing capital projects (including the enlargement or improvement thereof), which shall be distinctly specified in the law authorizing the same, of institutions and agencies administered solely by the executive department of the Commonwealth or of institutions of higher learning of the Commonwealth.

"Before any such debt shall be authorized by the General Assembly, and again before it shall be incurred, the Governor shall certify in writing, filed with the Auditor of Public Accounts, his opinion, based upon responsible engineering and economic estimates, that the anticipated net revenues to be pledged to the payment of principal of and interest on such debt will be sufficient to meet such payments as the same become due and to provide such reserves as the law authorizing such debt may require, and that the projects otherwise comply with the requirements of this subsection, which certifications shall be conclusive."

Article X, § 9, of the present Constitution is a successor to §§ 184, 184a and 187 of the Constitution of 1902, as amended in 1928. *The Constitution of Virginia, Report of the Commission on Constitutional Revision* at 307, 440 (1969) (hereinafter CCR Report).[2]

Section 184a of the former Constitution, as amended, prohibited the State from contracting debt unless the authorized

---

[2] For an informative history and analysis of Article X, § 9, *see* 2 A. Howard, *Commentaries on the Constitution of Virginia* 1095-1126 (1974).

State debt was submitted to and acted upon favorably by the people at a general election. This limitation appears in § 9 (b) of the present Constitution.

■ Against the background of constitutional restrictions prohibiting the contracting of debt by the State, the Special Fund Doctrine emerged. It permits revenue bonds to be issued for certain qualifying State revenue projects without violating the constitutional debt limitations. Under the Doctrine, no constitutionally prohibited indebtedness is created when bonds issued to finance a particular State capital project are to be paid solely from a special fund derived from the revenues of that project; when the legislature is not obligated to appropriate funds for payment of the indebtedness; and, when the indebtedness is not secured by the general faith, credit and taxing power of the State. *Button* v. *Day*, 205 Va. 739, 743, 139 S.E.2d 838, 840 (1965); *Button* v. *Day*, 204 Va. 270, 272-74, 130 S.E.2d 459, 461-62 (1963); *Harrison* v. *Day*, 202 Va. 967, 975-77, 121 S.E.2d 615, 620-21 (1961); *Almond* v. *Gilmer*, 188 Va. 822, 842-44, 51 S.E.2d 272, 280-81 (1949). *See also Board of Supervisors* v. *Massey*, 210 Va. 680, 173 S.E.2d 869 (1970); *Farquhar* v. *Board of Supervisors*, 196 Va. 54, 82 S.E.2d 577 (1954). This Doctrine remains intact and its use is authorized by § 9 (d) of the present Constitution. CCR Report at 319.

■ Section 9 (c) is new, and it incorporates the revenue bond concept of § 9 (d) but permits certain revenue producing project bonds to be further secured by a pledge of the full faith and credit of the State without the necessity of submitting the question to the electorate.

The purpose of § 9 (c) is to permit the General Assembly, under limited circumstances and under strict safeguards, to place the full faith and credit of the Commonwealth behind certain self-liquidating revenue producing State capital projects and thereby save large sums in interest on the bonds. "It is universally recognized that the interest rates paid on nonguaranteed revenue bonds are considerably higher than they would be on guaranteed, general obligation bonds with comparable covenants. Estimates of the difference between interest paid on nonguaranteed bonds and on guaranteed bonds range from one half of one per centum to one per centum. On

large issues with long term, the actual dollar difference is staggering. Yet, as a general rule, the risk of default on revenue bonds is slight since the feasibility of the projects financed by their proceeds is subject to stringent engineering and economic tests before the bonds can be marketed." CCR Report at 318. The framers of the section did not intend to provide for the creation of a debt for any new purpose, but to afford the means whereby debt that would be created anyway could be created on more advantageous terms. *Id.*

Therefore, under § 9 (c), funds can be obtained for financing certain revenue producing capital projects, or for their enlargement or improvement, by pledging the net revenues of the project, as well as the full faith, credit and taxing power of the Commonwealth, provided the debt is authorized by an extraordinary majority of the General Assembly and provided the required certifications of economic feasibility are made by the Governor.

The petitioner contends that the proposed bonds are valid and may be issued without an election, as would be required under § 9 (b). He argues that under the Special Fund Doctrine, as it existed prior to the adoption of the 1971 Constitution, State funds paid to MCVH for services rendered to indigent and medically indigent persons could have been included as revenues of the hospital. Since the project is feasible if monies received from the MCVHHS Fund are included as revenue, he argues that the pledge of the full faith and credit of the Commonwealth, which is permitted under § 9 (c), in no way affects the validity of the proposed bonds.

On the other hand, respondent argues that the Special Fund Doctrine is not applicable here because revenues generated by a public project or facility cannot include monies appropriated from the general funds of the Commonwealth which may or may not be available, depending upon the largess of the legislature.

We reject petitioner's contention.

Section 9 (c) is a unique constitutional provision. Although its genesis is the Special Fund Doctrine, it goes beyond this doctrine by authorizing the creation of debt for specific self-liquidating revenue producing capital projects secured by a pledge of the full faith and credit of the Commonwealth. The Commonwealth, as guarantor, makes a binding commitment for payment of bonds

issued under § 9 (c). No such obligatory undertaking by the Commonwealth is incurred in traditional revenue bonds issued under the Special Fund Doctrine. Manifestly, this fact distinguishes our Special Fund cases, which arose against a different constitutional background, from the present proceeding.

In *Almond, supra,* we held that revenue bonds issued pursuant to the State Revenue Bond Act, Acts 1940, c. 399 at 711, to finance the cost of acquiring, constructing and operating certain bridges and ferries, and payable solely out of the funds received from tolls and charges for the use of these properties, created or incurred no State debt or liability within the meaning of § 184a of the former Constitution.

In *Harrison, supra,* the Virginia State Ports Authority contracted with the Norfolk & Western Railway Company to purchase certain of its properties for the purpose of providing new port facilities. The cost of purchase and construction was to be paid from the sale of revenue bonds issued by the Authority. The facilities were to be leased to the railway for a term and at a rental sufficient to amortize the principal and interest on the bonds. The bonds were to be payable solely by the Authority from its revenues and were to contain a statement on their face that neither the faith and credit nor the taxing power of the Commonwealth was pledged. The Authority agreed, however, in its contract with N&W, that it would "urgently request" the General Assembly in each of its sessions to make appropriations, to a sinking fund, equal to fifty percent of the rent N&W was obligated to pay. The basic rent to be paid by N&W would be reduced by the amount of the appropriation, but the General Assembly was under no obligation to make any appropriation to the sinking fund.

We held, *inter alia,* that no debt was created in violation of § 184 of the former Constitution, nor was there a violation of § 185 thereof, which prohibited the lending of the credit of the State in aid of any person or corporation.

In *Button* v. *Day, supra,* 204 Va. 270, 130 S.E.2d 459, we considered the constitutional validity of bonds to be issued for construction of certain projects at educational institutions. We held that since the bonds, by express provision of the statute, did not constitute an indebtedness of the institution, but were to be paid only from a special fund derived from net revenues of the

project and the increases in fees, rents and charges from other existing facilities of the institution, the bonds were not debts of the State, and the case fell within the scope of the Special Fund Doctrine.

The decision of the second *Button* case, *supra*, was controlled by the first, the issues being similar. In the second case, the revenues of the project to be constructed were pledged for payment of the bonds and, in addition, so were the full revenues (not just the increases in revenues) of the existing facilities at the educational institution. We again applied the Special Fund Doctrine to sustain the validity of the legislation in question.

In *Massey*, *supra*, the peculiar nature of a continuing service contract saved the agreements of a county and a city from invalidity under provisions of the former Constitution which prohibited a city or a county from contracting debt. Under the service contract rule, we held that "a commitment for services to be paid for only after the services are rendered is *not* a commitment for debt or indebtedness within the meaning of constitutional limitations or prohibitions. Rather this commitment is to honor each year the account payable incurred for services rendered that year." 210 Va. at 683-84; 173 S.E.2d at 872.

Petitioner argues that the present case "is substantially less difficult" than *Massey* because, here, there is no agreement legally obligating the State to make any appropriations at any time beyond the present biennium. Nevertheless, he argues, the appropriations which may be made will be paid to MCVH on a case-by-case basis for services actually rendered indigents. He further contends that, as in *Massey*, the governmental expenditure is made in return for service, rather than as a guarantee of the payment of obligations, and, therefore, it does not constitute contracting debt in the proscribed sense.

This reliance on *Massey* is misplaced. *Massey* did not involve a pledge of the governmental unit's full faith and credit. *Massey* did not involve anticipated net revenues projected upon a known deficit. *Massey* did not develop against the background of the constitutional concept embodied in § 9 (c). The present proceeding is concerned with all of the foregoing factors foreign to *Massey*.

Fundamental to the decisions in *Almond*, *Harrison* and the two *Button* cases, as we have demonstrated, was the proposition

that the State incurred no legal liability to underwrite the project. In the present case, the State's obligation under § 9 (c) is fixed. From the inception of the project, the State would stand behind MCVH's proposed bonds with a pledge of its full faith and credit. Accordingly, we are of the opinion that the decisions of the Special Fund cases are not controlling here.

We are, therefore, brought directly to a decision whether the Bond Act creates a constitutionally prohibited State debt. We hold that it does.

The arrangement in this case is not the self-liquidating "revenue producing capital project," envisioned under § 9 (c). This project will be self-liquidating if its net revenues and its anticipated net revenues are sufficient to meet payments on the bonds as the same become due. But the sufficiency of these revenues depends (1) upon payment by the State through the MCVHHS Fund of the presently appropriated sum of over $25 million, about 30% of the estimated cost of the project, and (2) upon payment of additional monies derived from future appropriations to the MCVHHS Fund during later biennia. Notwithstanding the fact that these funds are channeled through the State Health Department as compensation for services rendered to indigents, the effect of this plan is to provide for a direct payment of appropriated funds from the State to MCVH, which funds may not be considered among "net revenues" within the contemplation of § 9 (c).

Furthermore, the General Assembly is not bound to make future appropriations to the MCVHHS Fund. So for this additional reason, these contingent funds cannot be properly included among "anticipated net revenues," within the meaning of § 9 (c).

Moreover, even though the State has no obligation to make these future payments for the specific purpose of indigent care, it would nonetheless have a continuing liability, under the pledge of its full faith and credit, to pay for MCVH's future deficits, incurred in the event payments were not made from other sources for the care of indigents. This circumstance results, therefore, in a binding and direct commitment by the State, under the pledge of its full faith and credit, to furnish revenues from its general funds to pay off the bonds. Accordingly, the approval of this arrangement would result in circumvention of the constitutional proscription of § 9 (b), which

requires approval by the voters of the Commonwealth before the State pledges its full faith and credit to finance capital projects.

We hold, therefore, that the amount of any past appropriations to reimburse MCVH for services to indigents does not constitute "net revenues" within the meaning of § 9 (c). Moreover, we hold that future appropriations which depend upon General Assembly action do not constitute "anticipated net revenues" within the meaning of § 9 (c). Finally, we hold that pledging the full faith and credit of the Commonwealth for the payment of these bonds without submission of the question to the people at an election violates Article X, § 9 of the 1971 Constitution of Virginia, since payment of the bonds depends directly upon appropriations by the General Assembly, and, to that extent, the Bond Act is unconstitutional.

For these reasons, the petition for a writ of mandamus is

*Denied.*