## Richmond

GERALD L. BALILES,
ATTORNEY GENERAL OF VIRGINIA

V.

EDWARD J. MAZUR, COMPTROLLER OF VIRGINIA

December 3, 1982.

Record No. 821123.

Present: All the Justices.

Harry Frazier, III (Gerald L. Baliles, Attorney General; William G. Broaddus, Chief Deputy Attorney General; Walter A. McFarlane, Deputy Attorney General; John G. MacConnell, Assistant Attorney General; James J. Knicely; Hunton & Williams, on briefs), for petitioner.

J. Durwood Felton, III, for respondent.

THOMPSON, J., delivered the opinion of the Court.

The Attorney General, by filing a petition for a writ of mandamus, invokes our original jurisdiction pursuant to Code § 8.01-653,[1] seeking adjudication as to the constitutionality of certain provisions of the "Virginia Public Building Authority Act of nineteen hundred eighty-one" (the Act). Acts 1981, c. 569; Code §§ 2.1-234.10 to -234.19.

---

[1] Under Code § 8.01-653, the Comptroller may, in those situations where he entertains doubt respecting the constitutionality, proper construction, or interpretation of an act of the General Assembly which directs payment of money out of the state treasury, withhold payment under the act until there has been a final adjudication made by this court. The Attorney General is empowered to file a petition for a writ of mandamus, directing the Comptroller to pay the money as provided in the act. This court is then required to:

Consider and determine all questions raised by the Attorney General's petition pertaining to the constitutionality or interpretation of any such act, even though some of such questions may not be necessary to the decision of the question of the duty of such Comptroller . . . to make payment of the moneys appropriated or directed to be paid.

On June 25, 1982, the Comptroller of Virginia (Comptroller) notified the Attorney General of doubts respecting the constitutionality, proper construction, and interpretation of the Act and raised certain questions for consideration by this court. The questions are:

1. Do the provisions of the Act empower the Virginia Public Building Authority (Authority) to undertake financial obligations to construct, improve, furnish, maintain, acquire, and operate public buildings for sale, lease, or conveyance to the Commonwealth which would violate the provisions of Article X, § 9 of the Constitution concerning the creation of debt to which the full faith and credit of the Commonwealth is pledged or committed?

2. Does the provision of the Act that the Authority shall not undertake any project or projects which are not specifically included and authorized to be undertaken in a bill or resolution passed by a majority of those elected to each house of the General Assembly violate the principle stated in Article I, § 5, and Article III, § 1, of the Constitution that the legislative, executive, and judicial departments of the Commonwealth shall be separate and distinct?

The essential facts are not in dispute and, as outlined in the petition for a writ of mandamus and accompanying brief, are:

The Authority was established as ". . . a body corporate and politic, constituting a public corporation and governmental instrumentality" for the purpose of "constructing, . . . maintaining, . . . and operating public buildings for the use of the State." The membership of the Authority includes the State Treasurer, the State Comptroller, and five additional members appointed by the Governor. Code §§ 2.1-234.12, -234.13.

The Authority is authorized to undertake only those projects specifically authorized in a bill or resolution passed by a majority of those elected to each house of the General Assembly. It has the power to (i) acquire, purchase, hold and use real and personal property; (ii) lease as lessor to the Commonwealth (and any of its political subdivisions or agencies), subject to the approval of the Governor, any project constructed by or any property at any time acquired by the Authority; and (iii) acquire by purchase, lease, or otherwise, and to construct, improve, furnish, maintain, repair, and operate projects. The Authority is also empowered to fix and collect rates, rentals, and other charges for use of its facilities or projects. Code § 2.1-234.13.

In furtherance of its purposes, the Authority may borrow money and issue notes, bonds, and other evidences of indebtedness and may secure such obligations by the pledge of its revenues, rentals, and receipts. The sum of all its obligations may not at any one time exceed $150,000,000. *Id.*

Code § 2.1-234.14 states, in part, that:

The principal of and interest on such bonds shall be payable solely from the funds provided in this article for such payment. Any bonds of the Authority issued pursuant to this Article shall not constitute a debt of the Commonwealth, or any political subdivision thereof other than the Authority, and shall so state on their face.

Rents, fees, and other charges for use of the Authority facilities are required to be fixed and adjusted so that the revenues, together with all available funds, will be sufficient to pay the cost of maintaining, repairing, and operating the Authority's projects, to pay the principal of and interest on its bonds, and to create reserves for such purposes. Revenues received by the Authority may be pledged and assigned to secure its obligations, but the Authority may not convey or mortgage any project or any part thereof as security for its bonds.

The Authority was organized on December 7, 1981. On January 11, 1982, the governing board (Board) unanimously adopted a resolution (the "January resolution") authorizing the acquisition and/or construction of three public office buildings and the lease thereof to the Commonwealth, and issuance of revenue bonds. The Board further authorized its chairman to take such action as may be necessary to obtain the requisite approvals from the General Assembly and the Governor. On June 17, 1982, the Board adopted a resolution (the "June Resolution") which ratified and reaffirmed the January Resolution and approved an outline of financing and plan of lease for the proposed projects.

Specifically, the January Resolution provides for the issuance of approximately $75,000,000 Public Office Building Revenue Bonds to (i) acquire the James Monroe Building (Phases I and II) (the "James Monroe Project") and the Department of Motor Vehicles Building (the "DMV Project"), both now leased to the Commonwealth by the Virginia Supplemental Retirement System (VSRS), and (ii) construct a building for the Commonwealth's Department

of Computer Services (the "Computer Services Project"). Each of these projects is located in the City of Richmond. The bonds will be secured by an assignment of all the Authority's rights to rental payments, rates, and fees charged for the use of or for the services and facilities associated with each project. The January Resolution expressly states that the bonds will be limited obligations payable solely from the revenues pledged for such purposes and that they will not constitute a debt of the Commonwealth or any political subdivision thereof other than the Authority.

*James Monroe and DMV Projects.* In consideration of the Authority paying to the Commonwealth an amount sufficient to pay the total investment of the VSRS in these projects, the Commonwealth will sell to the Authority for a nominal price the real property and improvements constituting the two projects. As to the James Monroe Project, the Authority will lease it to the Department of General Services for a period of 20 years, with rental payments sufficient to pay annual debt service on the bonds issued to finance its acquisition and to fund adequate reserves and administrative expenses. The DMV Project will be leased to the DMV for a period of two years, subject to automatic renewal for consecutive two-year terms over a twenty-year period.

The Department of General Services is required to request an annual appropriation from the General Assembly in the amount of the succeeding biennial rent payment to provide for the use, occupancy, and maintenance of such project. The two leases provide that upon the termination of the lease in 2002 A.D., fee simple title in the projects remains in the Authority. Both leases also contain clauses providing for early termination should funds for rental payments ever become unavailable.

If the Authority acquires these two existing buildings, the rental cost to the Commonwealth, based on the anticipated tax-exempt borrowing by the Authority at 11% per year, will be approximately $7,919,839 per year, compared with the present cost for the James Monroe and DMV Projects of approximately $9,585,210 per year, for an estimated annual savings for both projects of $1,665,371.

*Computer Services Project.* For a nominal price, the Authority will acquire real property from the Commonwealth and construct thereon a building to be used by the Department of Computer Services. The lease has a one-year term, with subsequent automatic yearly renewals for a period of 20 years, provided the requi-

site annual rental payments are always made. These rental payments will be sufficient to amortize the bonds of the Authority issued to acquire and construct the project, to pay for the cost of repairs and operations, and to fund adequate reserves and administrative expenses.

The Authority will enter into a 20-year agency agreement with the Department of General Services to maintain the project, subject to cancellation in the event the underlying lease is not renewed. As with the leases in the James Monroe and DMV Projects, fee simple title in the project remains with the Authority upon the termination of the lease in 2002 A.D. Unlike the other leases, however, there is no clause in the Computer Services Project lease requiring the Department of Computer Services to make an annual request to the General Assembly for appropriations.

I. *Are Revenue Bonds, Issued by the Authority, Debts of the Commonwealth in Violation of Article X, § 9, of the Constitution of Virginia?*

We hold that they are not. At the outset, we point out that the enabling legislation provides in part that "[a]ny bonds of the Authority issued pursuant to this Article *shall not constitute a debt of the Commonwealth, or any political subdivision thereof* other than the Authority, and shall so state on their face." (Emphasis added.) Acts 1981, c. 569, Code § 2.1-234.15. Also, the resolutions of the Authority are to the same effect:

> The Bonds will be limited obligations of the Authority payable solely from the revenues pledged thereto pursuant to the Indenture and shall not constitute a debt of the Commonwealth of Virginia or any political subdivision thereof other than the Authority.

In *Almond v. Gilmer*, 188 Va. 822, 51 S.E.2d 272 (1949), our first case recognizing the Special Fund Doctrine, we approved the issuance of revenue bonds by the State Highway Commission for the acquisition, construction, operation, and maintenance of certain highways, ferries, and bridges. The bonds were payable exclusively from a special fund composed of the revenues derived from the various projects.

We again considered the Special Fund Doctrine in *Harrison v. Day*, 202 Va. 967, 121 S.E.2d 615 (1961). There, the Virginia

State Ports Authority contracted with a railway company to purchase certain of its properties for the purpose of providing new port facilities. As in *Almond*, this project was underwritten by the issuance of revenue bonds, which, in turn, were payable solely from the revenues derived from the newly constructed port facilities. Once again, both the Act and the bonds expressly negated any obligation by the Commonwealth or any political subdivision thereof to pledge its faith, credit, or taxing power for the payment of the bonds.

In contrast to *Almond*, however, the Ports Authority, in its contract with the railway, agreed to "urgently request" the General Assembly to make annual appropriations during the term of the lease for the purpose of participating in the cost of the project to the extent of 50% of the basic rent. In his brief, the Comptroller argued that this equated to a "moral obligation" on the part of the Commonwealth to make the appropriations, in violation of the constitutional restrictions on state debt. Referring to the argument rejected in *Almond v. Gilmer, supra*, this court held that there was no constitutionally prohibited debt even though the "expectation" of these continued appropriations was an essential ingredient in the negotiations between the Ports Authority and the railway. This did not in any way contractually obligate the state to make these appropriations. For the sake of emphasis, we repeat here the quotation in *Harrison v. Day*, 202 Va. at 976, 121 S.E.2d at 621, from *Almond v. Gilmer*, 188 Va. at 841, 51 S.E.2d at 279:

> It is true that the Commission and the State of Virginia may stand by as benevolent protectors of this enterprise of their creation. The one may allocate any funds not otherwise allocated or prohibited, to aid in its acquisition, maintenance and operation, and the other may make such appropriations toward those ends as it may desire. Yet neither is required to assume such philanthropic role.

Recently, in *Miller v. Watts*, 215 Va. 836, 841, 214 S.E.2d 165, 169 (1975), we summarized the doctrine as follows:

> [N]o constitutionally prohibited indebtedness is created when bonds issued to finance a particular State capital project are to be paid solely from a special fund derived from the revenues of that project; when the legislature is not obligated to appropriate funds for payment of the indebtedness; and,

when the indebtedness is not secured by the general faith, credit, and taxing power of the State. [Citations omitted.]

In connection with the constitutional changes, we also said: "[The Special Fund] Doctrine remains intact and its use is authorized by § 9(d) of the present Constitution." *Id.* at 841, 214 S.E.2d at 169.

Against this background, the present Constitution of Virginia deals definitively with the subject of state debt:

Article X, § 9. State Debt.
No debt shall be contracted by or in behalf of the Commonwealth except as provided herein.

The revisers obviously had in mind the anticipated growth of capital projects as the Constitution enumerates in § 9(a), (b), and (c) methods by which certain projects can be financed. The Constitution further provides in § 9(d):[2]

(d) Obligations to which section not applicable.
The restrictions of this section shall not apply to any obligation incurred by the Commonwealth or any institution, agency, or authority thereof if the full faith and credit of the

---

[2] In this context, it is illuminating to consider the comment concerning § 9(d) contained in *The Constitution of Virginia, Report of the Commission on Constitutional Revision* 319 (Jan. 1, 1969), which states:

Added for the sake of clarity and completeness, this subsection serves to emphasize that the provisions of section 9 operate only when the full faith and credit of the Commonwealth is pledged or committed to the payment of an obligation. If an obligation in no way involves the Commonwealth's full faith and credit, then under the proposed section, as is the case at present, the constitutional debt limitations are not relevant.

Equally instructive are the relevant passages from A. Howard, *Commentaries on the Constitution of Virginia* 1126 (1974), where Professor Howard stated:

9(d). *Obligations to which section 9 is not applicable.* Section 9(d) was suggested by the Commission on Constitutional Revision for the sake of clarity and completeness and was accepted by the General Assembly without change. Section 9(a), 9(b), and 9(c) are all concerned with debt to which the full faith and credit of the Commonwealth is pledged. However, since the first sentence of section 9 states that no debt shall be contracted by or on behalf of the Commonwealth except as permitted by the Constitution itself, section 9(d) is necessary in order to make it clear that borrowing by the Commonwealth or by institutions, agencies, or authorities is in no way inhibited by section 9 so long as the full faith and credit of the Commonwealth is not pledged. It is therefore up to the Assembly or other competent authority to decide how much borrowing shall take place, for what purposes, and upon what conditions, when the State's full faith and credit is not involved.

Commonwealth is not pledged or committed to the payment of such obligation.

Thus, in the language of the document itself, we have one criterion for determining the existence of unconstitutional debt: Is the full faith and credit of the Commonwealth pledged or committed? If not, no unconstitutional debt is created.

The Comptroller argues that the Special Fund Doctrine is not applicable where the fund consists entirely of money appropriated by the legislature. We are aware of no such limitation upon the Doctrine. The Comptroller's argument is answered by our holding in *Harrison* v. *Day, supra.* The overriding consideration, therefore, is whether the legislative body is obligated to appropriate the funds, not the source or composition of the special fund.

The Comptroller assails the issuance of these revenue bonds as a transparent attempt to evade the constitutional debt limitations. On the basis of our previous decisions, we reject this contention.

## II. *Separation of Powers.*

Code § 2.1-234.13 of the Act provides in part: "The Authority shall not undertake any project or projects which are not specifically included in a bill or resolution passed by a majority of those elected to each house of the General Assembly, authorizing such project or projects."

The Comptroller reasons that this puts the legislative branch of government in the position of deciding which projects shall be undertaken and to that extent is an encroachment upon the domain of the executive branch of the government, forbidden under Article I, § 5, and Article III, § 1, of the Virginia Constitution. He cites *Infants* v. *Virginia Hous. Dev. Auth.*, 221 Va. 659, 674, 272 S.E.2d 649, 657-58 (1980), where the Virginia Housing Development Act required the Governor to make certain budget information and recommendations available to the General Assembly. We dismissed the constitutional attack, holding that the Governor should include the budget item involved as an agency request rather than a recommendation, and alluded to "the common link" existing between the legislative and executive branches of government. 221 Va. at 674, 272 S.E.2d at 658.

The present position of the Comptroller is equally untenable. In the early part of this century, when a separation-of-powers argument was made against the establishment of the State Corpora-

tion Commission, in *Winchester & Strasburg R.R. Co.* v. *Commonwealth*, 106 Va. 264, 270, 55 S.E. 692, 694 (1906), the court quoted *Story's Const.* (5th Ed.) 393, 395:

> "When we speak . . . of a separation of the three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link or dependence, the one upon the other, in the slightest degree. The true meaning is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments; and that such exercise of the whole would subvert the principles of a free constitution . . . . Indeed there is not a single constitution of any state in the union which does not practically embrace some acknowledgment of the maxim and at the same time some admixture of powers constituting an exception to it."

A similar situation recently arose in New Jersey, except that the legislature there had a power of veto over the projects rather than the right of prior approval. In *Enourato* v. *New Jersey Bldg. Auth.*, 182 N.J.Super. 58, 74, 440 A.2d 42, 50 (1981), *aff'd.*, 90 N.J. 396, 448 A.2d 449 (1982), the court said:

> In the circumstances it is entirely reasonable for the Legislature to have reserved to itself oversight over major projects. Surely the Legislature would be more likely to make the appropriation to fund the rent for a project if it had approved the project and if its presiding officers had approved the leases. Accordingly we view the provision for legislative oversight not as an encroachment on the executive but rather as an adjunct to the Legislature's undisputed power to provide for appropriation of money. The oversight provisions should thus be regarded as an entirely appropriate application of an inherently legislative function. Thus the constitutional requirement for separation of powers has not been infringed.

Where the legislative branch will be called upon to fund the project, in its discretion, we see no affront to executive powers by adding that condition precedent to the statute.

We therefore hold that the revenue bonds proposed to be issued by the Virginia Public Building Authority, as heretofore described, are not state debts in violation of Article X, § 9 of the Virginia Constitution because the full faith and credit of the Commonwealth is not pledged or committed to pay said bonds. We further hold that Code § 2.1-234.13, requiring prior authorization by the General Assembly of any project undertaken by the Authority, does not contravene the separation of powers as required by Article I, § 5, and Article III, § 1, of the Virginia Constitution.

The writ of mandamus prayed for is awarded.

*Writ awarded.*