OSGOOD TOWER

V.

NORTHERN VIRGINIA TRANSPORTATION DISTRICT
COMMISSION, ET AL.

Record No. 901037

November 8, 1991

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Keenan, JJ., and Poff,
Senior Justice

JUSTICE LACY delivered the opinion of the Court.

On May 3, 1990, the Northern Virginia Transportation District
Commission (the Commission) adopted a resolution providing for
the issuance of Northern Virginia Transportation District Com-
mission Fairfax County Transportation Contract Revenue Bonds
(bonds) in an amount not to exceed $330,000,000. The proceeds
from the sale of the bonds are to be used by Fairfax County to
complete the construction of the Fairfax County Parkway. On
May 4, 1990, the Commission and Fairfax County, as a plaintiff
intervenor, filed this bond validation proceeding pursuant to Code
§ 15.1-214 in the Circuit Court of Fairfax County. Osgood
Tower, Marcia P. Dykes, along with other unnamed taxpayers
and citizens of Fairfax County, opposed validation of the bonds.

On July 12, after extended hearings and argument, the trial
court validated the proposed bond issue. Tower and Dykes ap-
pealed. We consolidated the appeals and on April 19, 1991, this
Court determined that the trial court erred in validating the
bonds. The County and the Commission filed motions for rehear-
ing, which were granted on June 4, 1991.

Dykes and Tower argue that Art. VII, § 10(b) of the Virginia
Constitution is applicable to the debt which will be incurred by
issuing the bonds and, therefore, to be valid, the debt must either
be approved by a vote of the people or qualify within the judi-
cially-created "special fund" doctrine. They maintain that neither
of these criteria is met in this instance and, therefore, the bonds
are invalid.

■ The threshold issue for consideration is whether Art. VII, § 10(b) is applicable to the debt in issue. That section states in pertinent part:

No debt shall be contracted by or on behalf of any county or district thereof . . . except by authority conferred by the General Assembly by general law. The General Assembly shall not authorize any such debt . . . unless . . . provision be made for submission to the qualified voters of the county or district thereof . . . for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting such debt. Such approval shall be a prerequisite to contracting such debt.

### 1. Commission Debt

■ Dykes argues that this section is applicable to bonds issued by the Commission because the Commission is a *"district* 'created' by one or more cities and counties . . . proposing to issue bonds 'by or on behalf of' the County." This argument is unpersuasive. The use of the word "district" in the name of the Commission is insufficient to extend application of the section to it. Furthermore, the Constitution speaks in terms of a "district thereof." The Commission was authorized and created by statute, and is comprised of the Cities of Alexandria, Fairfax, and Falls Church, and the Counties of Arlington and Loudoun, in addition to Fairfax. Code §§ 15.1-342, *et seq.*; Acts 1964, c. 630. "It remain[ed] in a dormant state until brought into action by the local governing body." *Mumpower* v. *Housing Authority*, 176 Va. 426, 446, 11 S.E.2d 732, 739 (1940). The Commission clearly was not "created" by Fairfax County, and is not a "district thereof."

■ The Commission is an independent political subdivision in the same manner as are housing authorities, water and sewer authorities, and industrial development authorities. The enabling legislation, like that of these other authorities vested with the power to incur bonded indebtedness, affirms that debt so incurred is that of the entity, not of the Commonwealth or of any other political subdivision. Code § 15.1-1358.2(a)(2). This statement is repeated in the bonds themselves, as well as in other documents constituting the financing proposal. We have repeatedly held that the debt incurred by legislatively created, independent political subdivisions, whatever their title, is not the debt of the Common-

wealth or of any other governmental unit, and we affirm that holding here. *Button* v. *Day*, 204 Va. 270, 272-74, 130 S.E.2d 459, 461-62 (1963); *Farquhar* v. *Board of Supervisors*, 196 Va. 54, 61, 82 S.E.2d 577, 582 (1954); *Mumpower*, 176 Va. at 451, 11 S.E.2d at 742. Therefore, the debt which will be incurred by the Commission in issuing the bonds is not subject to the provisions of Art. VII, § 10(b) of the Virginia Constitution.

## 2. County Debt

Dykes and Tower next argue that the financing proposal underlying the issuance of the bonds creates a debt incurred by the County which is subject to the constitutional limitation of Art. VII, § 10(b). The financing proposal consists of a contract between the County and the Commission which has been approved but not yet executed, and a proposed trust agreement providing for the transfer of the Commission's interest in the payments received from the County.

■ The contract provides that the Commission will issue the bonds and that the County in turn will fund the annual principal and interest payments and other listed expenses of the bond issue. The repayment funds will come from the County's general revenues, including the Business, Professional, and Occupational License Tax "or any other revenue appropriated" by the County. Under the terms of the contract, however, the County's obligation to make the payments to the Commission "is subject to and contingent upon the annual appropriation by the County of moneys for such purpose."

■ Neither Tower nor Dykes seriously argues that the terms of the financing documents impose a *legally* enforceable obligation on the County to appropriate the funds or to repay the bonds. Indeed, the contract, the trust agreement, and the bonds, § 4.05, § 7.01, and ¶ 3, respectively, each specifically states that the County is not obligated to appropriate funds or levy taxes for the payment of the bonds and that the financing proposals do not constitute a pledge of the full faith and credit of the County.

Rather, Dykes and Tower invite us to define "debt" as used in Art. VII, § 10(b) as something other than a legally enforceable obligation to pay. Dykes says constitutional debt exists because the financing proposal creates obligations which the "County cannot avoid." Tower argues that "subject to appropriation" financing constitutes a pledge of the County's full faith and credit,

thereby establishing constitutional debt. Both rely on factors such as the understandings and expectations of bondholders, county officials, and bond rating agencies as creating obligations on the County. While these indicia may be significant in other contexts, such as whether the financing scheme is good or wise policy, or in determination of the investment grade or credit worthiness of the bonds, here we are only concerned with the limited question whether these indicia, or any other, establish a "debt" of the County subject to Art. VII, § 10(b).

We have described the attributes of "debt" for constitutional purposes in various ways. "[I]f the political entity is made generally liable, then an indebtedness is created within the debt limitations of the Constitution." *Terry* v. *Mazur*, 234 Va. 442, 450, 362 S.E.2d 904, 909 (1987) (quoting *Farquhar*, 196 Va. at 61, 82 S.E.2d at 582). Obligations which "are not secured by the general credit of the State or the issuing agency" do not constitute a debt within the constitutional limitation. *Button*, 204 Va. at 272, 130 S.E.2d at 461. And we have held that, for purposes of Art. X, § 9,

we have one criterion for determining the existence of unconstitutional debt: Is the full faith and credit of the Commonwealth pledged or committed? If not, no unconstitutional debt is created.

*Baliles* v. *Mazur*, 224 Va. 462, 471, 297 S.E.2d 695, 699 (1982). We have specifically rejected the proposition that "subject to appropriation" financing in which the legislative body is not legally obligated to make the appropriation creates state debt for constitutional purposes, *Almond* v. *Gilmer*, 188 Va. 822, 842-43, 51 S.E.2d 272, 280 (1949), and have reaffirmed that holding:

[T]here was no constitutionally prohibited debt even though the "expectation" of these continued appropriations was an essential ingredient in the negotiations . . . . This did not in any way contractually obligate the state to make these appropriations.

*Baliles*, 224 Va. at 469, 297 S.E.2d at 698-99 (referencing *Harrison* v. *Day*, 202 Va. 967, 121 S.E.2d 615 (1961)).

These cases, whether involving debt incurred by the state or by a county, share a single rationale. No debt is created for constitu-

tional purposes if the state or county "incurred no legal liability to underwrite the project." *Miller, Att. Gen.* v. *Watts, Treas.*, 215 Va. 836, 845, 214 S.E.2d 165, 171 (1975). The debt created must involve a "binding and direct commitment," *id.* at 845, 214 S.E.2d at 172, a commitment which can be enforced against the maker. There must be a *legal* obligation.

"Subject to appropriation" financing does not create constitutionally cognizable debt because it does not impose any enforceable duty or liability on the County. Expectations of bondholders, County officials, or bond rating agencies do not create County "debt" any more than the expectations of the railway for continued appropriations by the state created state debt in *Harrison* v. *Day, supra.*

Under the financing proposal at issue, neither the County nor its general revenues is liable for repayment of the debt incurred by the bond issue. In the absence of a legal obligation, the County has not incurred a debt cognizable under Art. VII, § 10(b).

In summary, we hold that Art. VII, § 10(b) is not applicable here because no constitutional debt was incurred by the County, and the debt of the Commission is not subject to that constitutional provision. In light of this holding, it is unnecessary to consider application of the special fund doctrine. We have also considered Dykes's other arguments and find them without merit.* Accordingly, we will affirm the judgment of the trial court.

Record Nos. 901033 and 901037 - *Affirmed.*

JUSTICE WHITING, with whom JUSTICE STEPHENSON and SENIOR JUSTICE POFF join, dissenting.

A rehearing of this case has produced no arguments which were not made and considered when a majority of this Court decided that the proposed bond issue was invalid.** No matter how the

---

* Tower's other assignments of error are not separately addressed. His arguments relating to maladministration by the County in violation of the Virginia Constitution parallel those of Dykes and those arguments, like Dykes's, are found to be without merit. Tower waived his remaining assignments of error at oral argument on rehearing.

** Amicus Curiae have filed briefs on rehearing asking, *inter alia*, that the original decision be made prospective only. I would have had no objection to such an application of the original opinion. *See, e.g., Harper* v. *Virginia Department of Taxation*, 242 Va. 322,

new majority phrases it, the present decision is simply an approval of an end run around the constitutional requirement of voter approval before a county can be saddled with long-term indebtedness. Accordingly, for the reasons expressed in the former majority opinion and in the dissent now filed by Justice Stephenson, I dissent.

JUSTICE STEPHENSON, with whom JUSTICE WHITING and SENIOR JUSTICE POFF join, dissenting.

I join Justice Whiting's dissent. I write separately, however, to express additional reasons to support my position.

Never before has this Court validated a bond issue like the one in question. I find the scheme employed by the County to be a shocking, patent attempt to circumvent and nullify the requirement of voter approval contained in § 10(b).

By the proposed contract with the Commission, the County would agree to make annual payments sufficient to pay the debt service on the bonds. The funds for these payments are derived solely from, and are contingent upon, annual appropriations from the County's general revenues.

The County contends, and the majority holds, that "no constitutional debt was incurred by the County" because the payments are contingent upon the annual appropriations. Although the County states that the bondholders can expect it to make continuous, annual appropriations, it relies upon its right and power not to do so, i.e., to default without fault, as making the scheme constitutional. We should not validate such a scheme.

More importantly, no government should employ such a scheme. Indeed, "government is, or ought to be, instituted for the common benefit, protection, and security of the people," Va. Const. art. I, § 3, and the preservation of a free government requires "a firm adherence to justice, moderation, temperance, frugality, and virtue," Va. Const. art. I, § 15. These quotations are not merely abstract terms; they are found in the Bill of Rights and have been part of our basic law since the Commonwealth was established.

410 S.E.2d 629 (1991); *Harper v. Virginia Department of Taxation*, 241 Va. 232, 240, 241-42, 401 S.E.2d 868, 873-74 (1991); *Perkins v. Albemarle County*, 214 Va. 416, 418, 200 S.E.2d 566, 568 (1973).

Is anyone so naive that they truly believe that the County, in reality, is not compelled to make annual appropriations until the bonds are retired? What are some of the consequences if the County ceases to make the appropriations? Obviously, the bond-holders would have no recourse, and their bonds would be worthless. Quite obviously, also, the County's credit would be seriously impaired, if not destroyed.

The § 10(b) requirement of voter approval of long-term county debt has existed for more than six decades. The requirement was not deleted when our Constitution was revised in 1971.

More recently, the General Assembly proposed an amendment to § 10 that would have allowed counties to issue bonds, without voter approval, "for transportation purposes, the principal and interest on which [would have been] payable exclusively from the pledge of the revenues and receipts of any local taxes . . . ." Acts 1989, c. 670; Acts 1990, cc. 736, 881. On November 6, 1990, however, this proposal was rejected overwhelmingly by the Commonwealth's voters.

Today, the majority, in effect, has sanctioned what the voters rejected. Consequently, by employing the approved scheme, counties now are at liberty to create bond indebtedness, payable from their general revenues, without submitting the matter to their voters. For all practical purposes, the § 10(b) debt proscription has been nullified by judicial fiat.