Richmond

MARSHALL COLEMAN, ATTORNEY GENERAL
OF VIRGINIA

v.

VINCENT J. PROSS, ACTING COMPTROLLER
OF VIRGINIA

July 25, 1978.

Record No. 780619.

Present: All the Justices.

*Henry M. Massie, Jr., Assistant Attorney General (Marshall Coleman, Attorney General of Virginia,* on brief) for petitioner.

*Andrew J. Brent (Lee F. Davis, Jr.; Hullihen Williams Moore; Leslie W. Mullins; Christian, Barton, Epps, Brent & Chappell,* on brief) for respondent.

COCHRAN, J., delivered the opinion of the Court.

Chapter 806 of the 1978 Acts of Assembly (the Act) directed the officers who will conduct the general election required by law to be held on November 7, 1978, to take in that election the sense of the qualified voters upon the ratification or rejection of certain proposed amendments to the Constitution of Virginia. Various duties required of the State Board of Elections in taking the vote on the proposed amendments will necessitate the expenditure of money from the State Treasury.

The Attorney General, having been notified that the Acting Comptroller entertained doubts as to the constitutionality of the Act, has initiated this mandamus proceeding pursuant to Code § 8.01-653 (Repl. Vol. 1977) and Rule 5:5. In his petition, the Attorney General seeks a determination that the 1977 and 1978 Joint Resolutions of the General Assembly proposing the amendments and the Act containing the amendments and referring them to the

electorate for final action are valid and constitutional, or in the alternative that the amendments would, in any event, be valid if ratified by a majority of the qualified voters voting in the November 7, 1978 election.

The facts are not in dispute. In 1977, the General Assembly approved Senate Joint Resolution No. 81, proposing certain amendments to Sections 6, 11 and 13 of Article IV and Section 6 of Article V of the Constitution. 1977 Acts of Assembly, c. 688.[1] The changes to be accomplished by the proposed amendments are apparent.

---

[1] Chapter 688 of the 1977 Acts of Assembly reads as follows:

"SENATE JOINT RESOLUTION NO. 81

"Proposing amendments to Sections 6, 11 and 13 of Article IV and Section 6 of Article V of the Constitution of Virginia, relating to legislative sessions, enactment of laws, effective dates of laws, presentation of bills to the Governor and veto powers.

"Agreed to by the House of Delegates, March 4, 1977
"Agreed to by the Senate, March 4, 1977

"RESOLVED by the Senate, the House of Delegates concurring, a majority of the members elected to each house agreeing, That the following amendments to the Constitution be, and the same hereby are, proposed and referred to the General Assembly at its first regular session held after the next general election of members of the House of Delegates for its concurrence in conformity with the provisions of Section 1 of Article XII of the Constitution of Virginia, namely:

"Amend Sections 6, 11 and 13 of Article IV and Section 6 of Article V of the Constitution as follows:

"Article IV.

"Section 6. Legislative sessions.

"The General Assembly shall meet once each year on the second Wednesday in January. No regular session of the General Assembly convened in an even-numbered year shall continue longer than sixty days; no regular session of the General Assembly convened in an odd-numbered year shall continue longer than thirty days; but with the concurrence of two-thirds of the members elected to each house, any regular session may be extended for a period not exceeding thirty days. Neither house shall, without the consent of the other, adjourn to another place, nor for more than three days.

"The General Assembly shall reconvene on the sixth Wednesday after adjournment, sine die, of each regular or special session for the purpose of considering bills which may have been returned by the Governor with recommendations for their amendment and bills and items of appropriation bills which may have been returned by the Governor with his objections. No other business shall be considered at a reconvened session. Such reconvened session shall not continue longer than three days unless the session be extended, for a period not exceeding seven additional days, upon the vote of a majority of the members elected of each house.

"The Governor may convene a special session of the General Assembly when, in his opinion, the interest of the Commonwealth may require and shall convene a special session upon the application of two-thirds of the members elected to each house.

"Section 11. Enactment of laws.

"No law shall be enacted except by bill. A bill may originate in either house, may be approved or rejected by the other, or may be amended by either, with the concurrence of the other.

"No bill shall become a law unless, prior to its passage:

"(a) it has been referred to a committee of each house, considered by such committee in session, and reported;

"(b) it has been printed by the house in which it originated prior to its passage therein;

"(c) it has been read by its title, or its title has been printed in a daily calendar, on three different calendar days in each house; and

"(d) upon its final passage a vote has been taken thereon in each house, the name of each member voting for and against recorded in the journal, and a majority of those voting in each house, which majority shall include at least two-fifths of the members elected to that house, recorded in the affirmative.

"Only in the manner required in subparagraph (d) of this section shall an amendment to a bill by one house be concurred in by the other, or a conference report be adopted by either house, or either house discharge a committee from the consideration of a bill and consider the same as if reported. The printing and reading, or either, required in subparagraphs (b) and (c) of this section, may be dispensed with in a bill to codify the laws of the Commonwealth, and in the case of an emergency by a vote of four-fifths of the members voting in each house, the name of each member voting and how he voted to be recorded in the journal.

"No bill which creates or establishes a new office, or which creates, continues, or revives a debt or charge, or which makes, continues, or revives any appropriation of public or trust money or property, or which releases, discharges, or commutes any claim or demand of the Commonwealth, or which imposes, continues, or revives a tax, shall be passed except by the affirmative vote of a majority of all the members elected to each house, the name of each member voting and how he voted to be recorded in the journal.

"Every law imposing, continuing, or reviving a tax shall specifically state such tax. However, any law by which taxes are imposed may define or specify the subject and provisions of such tax by reference to any provision of the laws of the United States as those laws may be or become effective at any time or from time to time, and may prescribe exceptions or modifications to any such provision.

"The presiding officer of each house or upon his inability or failure to act a person designated by a majority of the members elected to each house shall, not later than ~~twenty~~ three days after ~~adjournment~~ each bill is enrolled, sign ~~every~~ each bill that has been passed by both houses and duly enrolled. The fact of signing shall be recorded in the journal.

"Section 13. Effective date of laws.

"All laws, ~~except a general appropriation law~~ including laws which are enacted by reason of actions taken during reconvened sessions, shall take effect on the first day of ~~the fourth month~~ July following the ~~month of~~ adjournment of the session of the General Assembly at which it has been enacted, unless ~~a subsequent date is specified or unless~~ in the case of an emergency (which emergency shall be expressed in the body of the bill) the General Assembly shall specify an earlier date by a vote of four-fifths of the members voting in each house, the name of each member voting and how he voted to be recorded in the journal, or unless a subsequent date is specified in the body of the bill or by general law."

"Article V.

"Section 6. Presentation of bills; veto powers of Governor.

"Every bill which shall have passed the Senate and House of Delegates shall, before it becomes a law, be presented to the Governor. If he approve, he shall sign it; but, if not, he may return it with his objections to the house in which it originated, which shall enter the objections at large on its journal and proceed to reconsider the same. If, after such

Under proposed Section 6 of Article IV, on the sixth Wednesday after adjournment, *sine die,* of each regular or special session the General Assembly will be required to reconvene for the sole purpose of considering bills returned by the Governor with recommendations for amendment and bills and items of appropriation returned by the Governor with his objections. A reconvened session may last no longer than three days but can be extended up to ten days upon a vote of a majority of the members elected to each house.

Proposed Section 11 of Article IV, if approved, will shorten the time within which bills must be signed by the presiding officer of each house, from the present twenty days after adjournment to three days after the bill has been enrolled. The proposed amend-

---

consideration, two-thirds of the members present, which two-thirds shall include a majority of the members elected to that house, shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of all the members present, which two-thirds shall include a majority of the members elected to that house, it shall become a law, notwithstanding the objections.

"The Governor shall have the power to veto any particular item or items of an appropriation bill, but the veto shall not affect the item or items to which he does not object. The item or items objected to shall not take effect except in the manner heretofore provided in this section as to bills returned to the General Assembly without his approval.

"If the Governor approve the general purpose of any bill but disapprove any part or parts thereof, he may return it, with recommendations for its amendment, to the house in which it originated, whereupon the same proceedings shall be had in both houses upon the bill and his recommendations in relation to its amendment as is above provided in relation to a bill which he shall have returned without his approval, and with his objections thereto; provided that, if after such reconsideration both houses, by a vote of a majority of the members present in each, shall agree to amend the bill in accordance with his recommendation in relation thereto, or either house by such vote shall fail or refuse to so amend it, then and in either case the bill shall be again sent to him, and he may act upon it as if it were then before him for the first time; provided further that if the Governor so return any bill to a reconvened session and (i) a majority of the members present in each house agree to amend the bill in accordance with his recommendation, the bill as amended shall become law or (ii) two-thirds of all the members present in each house, which two-thirds shall include a majority of the members elected to that house, shall agree to the bill in the form sent to the Governor, the bill shall become law.

"In all cases above set forth, the names of the members voting for and against the bill or item or items of an appropriation bill, shall be entered on the journal of each house.

"If any bill shall not be returned by the Governor within seven days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly shall, by final adjournment, prevent such return; in which case it shall be a law if approved by the Governor, in the manner and to the extent above provided; within thirty days after adjournment but not otherwise, except that, if the General Assembly shall have adjourned pending a reconvened session, the Governor need not act upon the bill until thirty days after such adjournment. If the General Assembly shall, by final adjournment other than pending a reconvened session, prevent the return of a bill, it shall be a law if approved by the Governor, in the manner and to the extent above provided, within thirty days after adjournment, but not otherwise."

ment also includes a new provision that if the presiding officer is unable or fails to act, a person may be designated by a majority of the members elected to each house to sign the bill.

The proposed amendment to Section 13 of Article IV would make the first day of July the effective date of all laws, including those enacted during reconvened sessions, unless an earlier date is specified in an emergency bill or a subsequent date is specified in the body of the bill or by general law. At present, this section provides that all laws, except a general appropriation law, take effect on the first day of the fourth month following the month of adjournment, unless a subsequent date is specified or unless an emergency bill shall specify an earlier date.

Under the proposed amendment to Section 6 of Article V, a bill returned to a reconvened session by the Governor with suggested amendments will become law in the form returned by the Governor if approved by a majority of the members present in each house. Such a bill will become law in the form presented to the Governor upon a vote of two-thirds of the members present in each house, which two-thirds shall include a majority of the members elected to that house. In neither case will the Governor's approval be required. The present section provides that any bill not returned by the Governor within seven days becomes a law unless final adjournment prevents such return, in which case it becomes a law if approved by the Governor within thirty days after adjournment. The proposed amendment provides that any bill not returned by the Governor within seven days becomes a law except that, if the General Assembly shall have adjourned pending a reconvened session, the Governor has thirty days to act on the bill, and if the adjournment is not pending a reconvened session, the bill becomes a law if signed by the Governor within thirty days after adjournment. The effect of the proposed amendment to this section, if approved, would be to give the General Assembly opportunities, generally not available at present because of the passage of much legislation close to the date of adjournment, to override the Governor's vetoes.

Senate Joint Resolution No. 95, offered at the 1978 Session of the General Assembly, contained the same title as Senate Joint Resolution No. 81 (Acts 1977, c. 688), namely:

"Proposing amendments to Sections 6, 11 and 13 of Article IV and Section 6 of Article V of the Constitution of Virginia,

relating to legislative sessions, enactment of laws, effective date of laws, presentation of bills to the Governor and veto powers."

In its preamble, Senate Joint Resolution No. 95 recited that the amendments proposed were agreed to at the 1977 Session of the General Assembly by a majority of the members elected to each house and were referred to the 1978 Session, the next regular session held after the general election of members of the House of Delegates. The resolution then proposed, subject to approval by a majority of the members elected to each house, the four amendments incorporated in Chapter 688 of the 1977 Acts of Assembly, in conformity with the provisions of Section 1 of Article XII, entitled "Future Changes", of the Constitution.[2] The resolution was agreed to by the Senate without amendment and was communicated to the House of Delegates, where it was referred to the Committee on Privileges and Elections. The resolution was there amended by Committee amendment in the Nature of a Substitute for Senate Joint Resolution No. 95, which deleted from the title and the text every reference to the proposed amendment to Section 13 of Article IV. Senate Joint Resolution No. 95, as thus amended, was duly agreed to by a majority of the members elected to the House of Delegates, and was concurred in by a majority of the members elected to the Senate. It became Chapter 852 of the Acts of Assembly of 1978.

Senate Bill 523, offered in 1978 to activate the election machinery to put the proposed constitutional amendments before the qualified voters in the November election, was replaced by Committee Amendment in the Nature of a Substitute for Senate Bill No. 523 (proposed by the Senate Committee on Privileges and Elections) with the following title:

"A Bill to provide for the submission of proposed amend-

---

[2] "Section 1. Amendments.

"Any amendment or amendments to this Constitution may be proposed in the Senate or House of Delegates, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, the name of each member and how he voted to be recorded, and referred to the General Assembly at its first regular session held after the next general election of members of the House of Delegates. If at such regular session or any subsequent special session of that General Assembly the proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the voters qualified to vote in elections by the people, in such manner as it shall prescribe and not sooner than ninety days after final passage by the General Assembly. If a majority of those voting vote in favor of any amendment, it shall become part of the Constitution on the date prescribed by the General Assembly in submitting the amendment to the voters."

ments to Sections 6, 11 and 13 of Article IV and Section 6 of Article V of the Constitution of Virginia to the qualified voters for ratification or rejection, and to prescribe when and how such referendum shall be conducted and when such amendments shall take effect."

All four proposed amendments were set forth in the Committee Amendment which was reported to and approved by the Senate. Subsequently, the Committee on Privileges and Elections of the House of Delegates reported a Committee Amendment in the Nature of a Substitute to Senate Bill No. 523, as amended by the Senate, which deleted each reference in the title and text to the proposed amendment to Section 13 of Article IV. This Committee Amendment was duly approved by the House and the Senate and became Chapter 806 of the 1978 Acts of Assembly. The Act provided that if a majority of the qualified voters vote in favor of the amendments, they shall become effective on January 1, 1979.

The stipulation to which the parties have agreed shows that Chapter 688 of the 1977 Acts of Assembly (Senate Joint Resolution No. 81), and Chapters 852 and 806 of the 1978 Acts of Assembly (Senate Joint Resolution No. 95 and Senate Bill 523, respectively) were approved in conformity with the Rules of the Senate and the Rules of the House of Delegates. The stipulation further shows that the proposed amendments were agreed to in 1977 by a majority of the members elected to each of the two houses, that the proposed amendments were entered on the Journals of the Senate and House, that the name of each member and how he voted were recorded, that the proposed amendments were referred to the General Assembly at its first regular session held after the next general election of members of the House of Delegates, and that the proposed amendments, except for the proposed amendment to Section 13 of Article IV, were agreed to in 1978 by a majority of the members elected to each of the two houses, all as expressly required by Section 1 of Article XII of the Constitution. The critical question, therefore, is whether deletion by the 1978 General Assembly of one of the amendments proposed by the 1977 General Assembly violates the additional mandate of that constitutional provision that proposed amendments be approved at two sessions of the General Assembly with a general election of members of the House of Delegates intervening.

As the Act will require the expenditure of money out of the State Treasury, we agree with the Attorney General and the

Comptroller that we have jurisdiction in this proceeding under the provisions of Code § 8.01-653. *Troy v. Walker*, 218 Va. 739, 744, n. 3, 241 S.E.2d 420, 423 (1978).

The Constitution is the fundamental law of Virginia. It is the charter by which our people have consented to be governed; it sets forth the basic rights and principles sought to be maintained and preserved in a free society; it establishes the organizational structures of State and local governments; and it provides for the financing of governmental functions by taxation. *See Commonwealth v. Newport News,* 158 Va. 521, 545, 164 S.E. 689, 696 (1932). Being the document by which the powers of government are limited, it is the creator of the branches of government. *See Kamper v. Hawkins,* 3 Va. (1 Va. Cases) 20, 24 (1793). Comparison of the two documents reveals that the 1971 Constitution has eliminated many detailed provisions of the 1902 Constitution deemed to be of less than constitutional dimension and more appropriately left for legislative disposition. *See* Report of the Commission on Constitutional Revision, p. 9 (1969). Nevertheless, the prerequisites for the enactment of laws and for the amendment of the Constitution are still set forth in precise language and minute detail evidencing the importance attached to these functions. Thus, the people have a nearly unlimited power to control and amend the Constitution, subject only to the limitations imposed by the United States Constitution; however, one of the two amendatory processes specified in the Virginia Constitution must be followed if a valid amendment is to be effected. *Staples v. Gilmer,* 183 Va. 613, 623, 33 S.E. 2d 49, 53 (1945).

An express provision for constitutional amendment was first included in the 1870 Constitution, approved by the voters in 1869, as Article XII. Any amendment (or amendments) could be proposed in the Senate *and* House of Delegates, "and if the same" should be agreed to by a majority of those elected to each house, would be entered in the respective Journals, with the "ayes and noes taken thereon", referred to the General Assembly to be chosen at the next general election of senators and members of the House of Delegates, and published for three months prior to that election. If the proposed amendment should be agreed to by a

majority of members elected to each house of the second General Assembly, then it must be submitted to the people for ratification or rejection.[3]

Section 196 of Article XV of the 1902 Constitution followed closely the language of Article XII of the 1870 Constitution as to the non-convention method of amendment by providing for constitutional amendments to be proposed in either the Senate *or* the House of Delegates. However, in the 1902 provision, the election intervening between the approving actions of the two General Assemblies was specified as the next general election of members of the House of Delegates, rather than the next general election of members of the Senate and House of Delegates.[4] Present Article XII, Section 1, except for a few inconsequential changes in language, is identical to Article XV, § 196 of the 1902 Constitution. Thus, for more than one hundred years, constitutional amendment by the non-convention method has necessitated compliance with the requirements of a deliberately lengthy, precise, and balanced procedure.[5]

■ There is a presumption of validity which attaches to the Act, as it does to any statute enacted into law by the General Assembly. *See City of Roanoke v. Elliott*, 123 Va. 393, 406, 96 S.E. 819, 824

---

[3] Article XII also provided that at the general election to be held in 1888 and each twentieth year thereafter the question whether there shall be a convention to amend and revise the Constitution must be submitted to the voters qualified to vote for members of the General Assembly.

[4] The constitutional convention method of amendment was addressed in Section 197 of Article XV of the 1902 Constitution, which provided that, on recorded affirmative vote of a majority of members elected to each house of the General Assembly, the question whether there shall be a convention to revise and amend the Constitution shall be submitted to voters qualified to vote for members of the General Assembly.

Section 2 of Article XII of the 1971 Constitution has eliminated voter approval as a prerequisite to a constitutional convention. It requires a vote of two-thirds of those elected to each house of the General Assembly to call a constitutional convention to consider either a general revision or specific amendments, and further mandates that the proposals of the convention be submitted to the voters and approved by a majority of those voting. Therefore, under either alternative procedure now available for constitutional amendments the voters determine the result.

[5] The 1902 Constitution, which shortened the time span by redefining the general election required to intervene between approving sessions of the General Assembly, was ordained and proclaimed by the Constitutional Convention of 1901-02. It was never ratified by the voters, but on the basis of usage, acceptance and acquiescence in its authority by the people and by their governmental officers and agents, its validity was upheld in *Taylor's Case*, 101 Va. 829, 44 S.E. 754 (1903).

(1918). In the present case, however, it is incumbent upon us to determine whether the proposed constitutional amendments incorporated into the Act were themselves properly approved for submission to the voters in accordance with the provisions of the Constitution.

■ Under the unambiguous language of Article XII, Section 1, if any constitutional amendments are proposed in one house, "the same" must be agreed to by a majority of the members elected to each house, referred to the next regular session after the intervening general election of House of Delegates members, agreed to by a majority of the members elected to each house, and submitted to the qualified voters. We hold that strict compliance with these mandatory provisions is required in order that all proposed constitutional amendments shall receive the deliberate consideration and careful scrutiny that they deserve. *See* Proceedings and Debates of the House of Delegates Pertaining to the Amendment of the Constitution, p. 498 (Extra Session 1969).

There must be agreement between House and Senate on the same proposed amendments in each of the two sessions of the General Assembly before the amendments may properly be submitted to the electorate. This mandate has been acknowledged by members of the General Assembly. *See* Proceedings and Debates of the House of Delegates Pertaining to the Amendment of the Constitution, p. 785 (Regular Session 1970). And, indeed, similar requirements in other state constitutions that proposed constitutional amendments be approved by two sessions of the legislature have been construed to mean that there must be approval of the same precise proposal at each session. *Selzer v. Synhorst*, 253 Iowa 936, 952, 113 N.W. 2d 724, 733 (1962); *State ex rel. Owen v. Donald*, 160 Wis. 21, 57, 151 N.W. 331, 342 (1915).

■ The Attorney General says, and we agree, that the second General Assembly may approve some and disapprove other proposed constitutional amendments referred to it by the first General Assembly. This pattern was followed by the 1970 General Assembly in acting upon proposed amendments approved and referred by the 1969 Special Session; several of the proposed amendments approved in 1969 were rejected at the 1970 Session. But we are aware of no amendatory resolution that was revised or changed in any respect by the 1970 General Assembly and then submitted to the qualified voters in the next general election. The proposed amendments that were submitted to and ratified by the

voters in 1970 had been incorporated in resolutions approved without change by both General Assemblies. It does not follow, therefore, that the validity of any revision made by the second General Assembly should depend, as the Attorney General argues, upon the degree of change effected. We reject such a flexible concept which could ultimately frustrate the purposes of the present protective procedure.

When revisions in proposed constitutional amendments have been made in Virginia by the second General Assembly, the amended proposal has been referred for approval to the next regular session after the next general election of members of the House of Delegates before submission to the voters. *See, e.g.,* 1946 Acts, c. 404 (1947 Acts p. 148); 1948 Acts, c. 555; and 1950 Acts, c. 596, in which a proposed constitutional amendment was agreed to by both houses in 1946 but was revised in 1948; the proposed amendment, so revised, was approved by both houses in 1948, was referred to the 1950 General Assembly, and was approved by both houses at the 1950 Session.

It is the contention of the Attorney General that there has been full compliance with the amendatory requirements because the three amendments now proposed were approved at the 1978 Session of the General Assembly without change in the language of these amendments as approved at the 1977 Session. The resolution approved by the 1977 General Assembly, however, proposed four amendments, whereas the resolution finally approved by the 1978 General Assembly proposed only three of the four. As the Attorney General concedes, the proposed amendment to Section 13 of Article IV was not the subject of a separate resolution, and was not intended to be submitted separately from the general scheme of amendments included in a single resolution. The amendments agreed to in 1978 were not the same amendments agreed to by the 1977 General Assembly and referred to the 1978 General Assembly. Revisions were made in 1978 in both title and text of the amendatory resolution.

The principal argument advanced by the Attorney General is that under the doctrine of severability, the proposed amendment to Section 13 of Article IV, which he suggests may have been deleted in 1978 because it might have had the effect of requiring a

general appropriation law to be enacted as emergency legislation,[6] could be severed from the other amendments without impairing the legislative intent. We have applied the doctrine of severability where a portion of a statute has been held to be invalid and we were able to determine that it was the legislative intent, absent a severability clause, that the other portions of the statute remain in effect. *Waynesboro v. Keiser*, 213 Va. 229, 235, 191 S.E. 2d 196, 200 (1972). But the doctrine is not applicable in this case.

*McWhirter v. Bridges*, 249 S.C. 613, 155 S.E. 2d 897 (1967), upon which the Attorney General strongly relies in his severability argument, is unpersuasive. In that case, the constitutionality of an amendment to the South Carolina Constitution to raise the debt limitation of a school district was challenged. Under the South Carolina Constitution, a constitutional amendment must be approved by both Senate and House, then by the voters, and again by the Senate and House, and the approving votes in each house must be recorded. An amendment was proposed in the House to raise the debt limitation in a designated school district from 15% to 20%. The Senate, by amendment, raised the limitation to a level "not exceeding 25%", in which action the House concurred, but only by voice vote. The amendment, as revised by the Senate, was approved by the voters and ratified by the next session of the General Assembly. The South Carolina Supreme Court, finding that approval of the amendment in the House by voice vote violated the constitutional provision, and that the House had validly approved only the increase to 20%, held that the amendment was valid to increase the limitation only to that extent, rather than to 25%, on the theory that "not exceeding 25%", the language approved by the Senate, necessarily included the lesser figure of 20% previously approved by the House on a recorded vote.

Citing with approval the general rule that when part of an amendment to a state constitution is invalid because it violates the United States Constitution, the valid parts may be saved, unless it is obvious that the intent was to accept one general scheme in its entirety, the Court then applied the same principle of severability to a defect in the process of amending the South Carolina Constitu-

---

[6] Under the provisions of Section 11 of Article IV, emergency legislation becomes effective at an earlier date if the General Assembly so specifies by a vote of four-fifths of the members voting in each house. At present, a general appropriation law is effective from its passage, unless another date is specified in the act itself. Code § 1-12 (Repl. Vol. 1973).

tion. In doing so, it appears that the Court in effect validated, on the basis of substantial compliance, a different amendment from the one approved by the voters in South Carolina.

Although we acknowledge that the primary purpose of the proposed amendments is to expand the authority of the General Assembly in overriding a Governor's vetoes, we do not believe that the proposed amendment to Section 13 of Article IV can be characterized as irrelevant, unimportant or inconsequential. This proposed amendment was an integral part of a package of four interrelated amendments which not only provided for reconvened sessions of the General Assembly to consider bills vetoed by the Governor, but also established a new time frame within which certain actions would be required, and specified a new effective date for laws, including the most controversial - those enacted without the Governor's approval. It cannot be said that the viability of the other three proposed amendments depends upon the approval of the proposed amendment to Section 13 of Article IV. Nevertheless, in view of the proposed reconvened sessions of the General Assembly, the significance of attempting to avoid unnecessary confusion by establishing one date on which all laws, unless specifically excepted, would become effective, cannot be ignored. We hold, therefore, that the proposed amendment to Section 13 of Article IV could not be severed from the amendatory resolution to permit final legislative approval of the other three proposed amendments by the 1978 General Assembly.

Finally, the Attorney General urges us to hold that if the three amendments now proposed to the Constitution are submitted to and approved by the voters, they will be valid. In arguing that there has been substantial compliance with the requirements of the amendatory process sufficient to validate the amendments upon approval by the people, he relies upon *City of Danville v. Ragland*, 175 Va. 27, 7 S.E.2d 121 (1940). That was a case where twelve years after the effective date of the 1928 revision of the 1902 Constitution, it was found that there was a defect in the amendatory process. Section 119 of Article VIII of the 1902 Constitution, as amended in 1928, provided that the duties and compensation of a commissioner of revenue shall be prescribed "by general law". It was found that the word "general", in the resolution approved by House and Senate and in the implementing bill to submit the proposed amendment to the electorate, had been omitted from the enrolled bill (Acts 1928, c. 205, p. 667) and from

the submission to the voters. We held that the amendment, excluding the word "general", as submitted to and approved by the voters, was valid. Thus, we validated the amendment which was in form different from that agreed to by the two sessions of the General Assembly. *See* Acts 1928, c. 46, p. 281.

*Ragland* is authority for the principle that where voter approval of a constitutional amendment has been obtained and the amendment has been given effect, a subsequent review of the amendatory procedure will not result in invalidating the amendment if there was substantial compliance with the procedural requirements. We there dealt with a clerical defect discovered many years after approval and acceptance by the people of a comprehensive constitutional revision embraced in one resolution proposing amendments to numerous sections of the 1902 Constitution.

In the present case, we are called upon to determine whether proposed constitutional amendments have been agreed to in accordance with the provisions of the legislative amendatory process prior to submission of the proposed amendments in proper form to the voters for their decision. The wisdom of the General Assembly in enacting Code § 8.01-653 is apparent. Defects and errors may be revealed which will require further consideration and action by the General Assembly. Voters have the right to act on proposed constitutional amendments with confidence, secure in the knowledge that the proposals have been put to them for final action only after careful analysis, elimination of errors of form and substance, and approval, without change, by the requisite number of members of each house in two General Assemblies.

The principle of substantial compliance, which is predicated upon a failure of strict compliance with applicable requirements, operates to replace the protective safeguards of specificity with a less exacting standard of elasticity, in order to achieve a beneficial and pragmatic result. This doctrine is most appropriately used in cases such as *Ragland,* where inadvertent and unforeseen procedural defects were discovered in long-accepted constitutional amendments. However, this doctrine is not applicable in the present case. In the first place, the failure to comply is substantial, so that there has been no substantial compliance. Moreover, we hold that in determining whether proposed amendments to the Constitution may properly be referred to the electorate, a standard of strict compliance with all specified prerequisites, rather than a standard of substantial compliance, must be applied.

As the proposed amendments approved at the 1978 Session of the General Assembly and embodied in the Act were not the same as the proposed amendments approved at the 1977 Session, there has not been strict compliance with the provisions of Article XII, Section 1 of the Constitution. Accordingly, the petition for a writ of mandamus will be denied.

*Writ denied.*