MARY SUE TERRY, ATTORNEY GENERAL OF VIRGINIA

v.

EDWARD J. MAZUR, COMPTROLLER OF VIRGINIA

Record No. 870428

November 25, 1987

Present: All the Justices

*Harry Frazier, III; Kenneth W. Thorson, Senior Assistant Attorney General (Bryar C. Nettles; Mary Sue Terry, Attorney General; H. Lane Kneedler, Chief Deputy Attorney General; Walter A. McFarlane, Deputy Attorney General; John M. McCarthy, Senior Assistant Attorney General; Barbara M. Rose, Assistant Attorney General; Hunton & Williams, on briefs), for petitioner.*

*Dexter S. Odin (Robert K. Richardson; Odin, Feldman & Pittleman, P.C., on brief), for respondent.*

*Amicus Curiae:* The Virginia Municipal League, Virginia Chamber of Commerce, Virginia Retail Merchants Association, Virginia Asphalt Association, Virginia Economic Developers Association, The Greater Washington Board of Trade, Batman Company, Inc., Best Products Co., Inc., Buvermo Management, Inc., Commonwealth Gas Companies, County of Fairfax, County of Loudoun, G T Realty and Management Co., Inc., The Henry A. Long Company, James River Corporation, Mobil Oil Corporation, S&K Famous Brands, Scott & Stringfellow, Inc., Signet Banking Corporation, Trammel Crow Company, Webb/Sequoia, and Wheat First Securities, Inc. (William G. Broaddus; William J. Strickland; Arthur E. Anderson; McGuire, Woods, Battle & Boothe, on brief), for petitioner.

STEPHENSON, J., delivered the opinion of the Court.

Invoking our original jurisdiction, the Attorney General of Virginia instituted this mandamus proceeding pursuant to Code § 8.01-653.1 (1987 Cum. Supp.) to establish the constitutionality of various provisions of Chapter 13 of the Acts of Assembly, 1986 Special Session (the Act). The Act made substantial changes to the State Revenue Bond Act, Code §§ 33.1-267 through -295 (the Bond Act), and to legislation providing sources of revenue for the repayment of revenue bonds to be issued to fund highway-related capital improvements.

The Comptroller of Virginia challenges the constitutionality of the Act. He has advised the Attorney General that he will make no payments pursuant to the Bond Act until we decide the following questions:

(1) Whether the provisions of the Act empowering the Commonwealth Transportation Board (the Board) to issue revenue bonds secured by highway user revenues, as defined in the Act, for the purpose of financing capital improvements to highways in the Commonwealth, violate the provisions of Article X, § 9 of the Constitution of Virginia concerning the creation of debt to which the full faith and credit of the Commonwealth is pledged or committed.

(2) Whether a pledge of highway user revenues from certain excise taxes authorized under the Act constitutes an appropriation in excess of the two-and-one-half-year limitation on appropriations contained in Article X, § 7 of the Constitution.

(3) Whether the provisions of the Act (a) permitting the pledge of highway user revenues to secure bonds, or (b) authorizing the Board, with the approval of the General Assembly, to contract with bondholders to maintain highway user revenues at agreed-upon minimum levels, contravene Article IV, § 15 of the Constitution, which provides that "[a]ny general law shall be subject to amendment or repeal."

Generally, the Act establishes a new approach to financing the Commonwealth's transportation needs. The gist of the new approach is the extension of the revenue bond concept from bonds secured only by a pledge of project-derived tolls and user fees to bonds secured by a pledge of highway user revenues, including

excise taxes on gasoline and other fuels, and other taxes and fees related to motor vehicles.[1]

The Act creates a new, special nonreverting fund in the Department of the Treasury called the Transportation Trust Fund (the Fund). Code § 33.1-23.03:1 (1987 Cum. Supp.). The Fund consists, in part, of the additional revenues authorized by the General Assembly in its 1986 Special Session, Code § 33.1-23.03:1(3) (1987 Cum. Supp.), including "highway user revenues." "Highway user revenues" are defined as:

> any motor fuel tax, special fuel tax, sales or use tax related to the ownership or operation of a motor vehicle, license fee or tax related to the ownership or operation of a motor vehicle, the motor fuel tax levied in § 58.1-2105, except such tax levied on aviation fuel, the special fuel tax levied in § 58.1-2116, except such tax levied on aviation fuel, the motor vehicle sales and use tax levied in § 58.1-2402 and the road tax levied in § 58.1-2701.

Code § 33.1-268(8) (1987 Cum. Supp.). The Fund, less a total of 15% set aside for seaports, airports, and mass transit, "shall be expended for capital improvements including construction, reconstruction, maintenance, and improvements of highways . . . or to secure bonds issued for such purposes, as provided by the Board and the General Assembly." Code § 33.1-23.03:2 (1987 Cum. Supp.).

The Act establishes the Board as the successor to the State Highway and Transportation Board, formerly known as the State Highway and Transportation Commission. Code § 9-6.25:2 (1987 Cum. Supp.). The Board is authorized to issue highway user revenue bonds, "payable from earnings and from any other available sources of funds," to finance the cost of highway projects. Code § 33.1-269(2a) (1987 Cum. Supp.). These "earnings" and "other available sources of funds" consist of highway user revenues.[2] *See* Code § 33.1-268(9) (1987 Cum. Supp.) (definition of "reve-

---

[1] The Act did not alter the Board's authority to use toll revenues to secure toll revenue bonds issued pursuant to the Bond Act.

[2] The parties have stipulated that the Act does *not* permit a pledge of revenues from taxes imposed by the Virginia Retail Sales and Use Tax Act, Code § 58.1-600 *et seq.* or any other taxes, except those included in the definition of the terms "highway user revenue" or "highway user revenues."

nues"); Code § 33.1-268(2)(p) (1987 Cum. Supp.) (definition of "projects"); Code § 33.1-277 (1987 Cum. Supp.) (1986 amendment to pledge provision).

"Project," which formerly meant a distinct, specifically identified road, bridge, or tunnel system, has been redefined as:

> Any other highway, road or street (including all bridges, tunnels, overpasses, underpasses, interchanges, entrance plazas, approaches, service buildings, and administration, storage and other buildings and facilities), which the Board may deem necessary for the operation of such project, together with all property, rights, easements and interests which may be acquired by the Board for the construction or the operation of such projects, constructed under the provisions of this article by the Board, the financing for which is to be paid from highway user revenues, subject to the limitations and approvals in § 33.1-279.1.

Code § 33.1-268(2)(p) (1987 Cum. Supp.).

Code § 33.1-277 (1987 Cum. Supp.) provides that revenue bonds issued under the Bond Act "shall not be deemed to constitute a debt of the Commonwealth . . . or a pledge of the faith and credit of the Commonwealth." The Commonwealth, however, is obligated to impose and pledge highway user taxes and to appropriate these revenues for the payment of the bonds. *Id.* The Act further permits the Board to contract with bondholders of highway user revenue bonds that the pledged highway user revenues "will not be reduced below limits agreed to by the Board and authorized or approved by the General Assembly." Code § 33.1-285 (1987 Cum. Supp.).

The Act imposes two prerequisites to the issuance of highway user revenue bonds. First, the amount of the debt secured in whole or part by highway user revenues must be "authorized or approved by the General Assembly." Code § 33.1-279.1(A)(i) (1987 Cum. Supp.). Second, the debt secured by highway user revenues, less amounts in sinking funds to pay such debts, cannot exceed 1.15 times the average annual revenues generated by highway user taxes during the three fiscal years immediately preceding the year the debt is incurred. Code § 33.1-279.1(A)(ii) (1987 Cum. Supp.). In addition, the Act imposes a $1 billion cap on the total

principal amount of outstanding bonds secured by highway user revenues (less amounts set aside in sinking funds). *Id.*

 We first consider whether highway user revenue bonds constitute debts proscribed by Article X, § 9 of the Constitution. The purpose and intent of Article X, § 9 is to provide a controlled limitation on the amount of debt for which the full faith and credit of the Commonwealth can be pledged. The section provides that "[n]o debt shall be contracted by or in behalf of the Commonwealth," except as provided therein. The exceptions are clearly defined and circumscribed in subsections (a), (b), and (c) of § 9.

Subsection (a) permits the contracting of debts "to meet emergencies and redeem previous debt obligations." The types of debts contemplated by § 9(a) are those (1) "to suppress insurrection, repel invasion, or defend the Commonwealth in time of war," (2) "to meet casual deficits in the revenue or in anticipation of the collection of revenues . . . for the then current fiscal year," and (3) "to redeem a previous debt obligation of the Commonwealth." Debts contracted under § 9(a) must be secured by the pledge of the full faith and credit of the Commonwealth.

Subsection (b) of § 9 authorizes debt for capital projects that are "distinctly specified" in the enabling legislation. These debts, for which the full faith and credit of the Commonwealth shall be pledged, must be affirmed by the people at a general election. Total § 9(b) debt over a three-year period shall not exceed 25 percent of 1.15 times the average annual revenues from income and retail sales taxes for the three fiscal years immediately preceding the authorization.

Subsection (c) of § 9 permits the creation of debt for "certain revenue-producing capital projects." This subsection authorizes the issuance of revenue bonds secured by a pledge of net revenues of a project and the full faith and credit of the Commonwealth, provided that (1) the Governor certifies in writing both before the General Assembly authorizes the debt and again before the debt is incurred that the anticipated net revenues from the capital project will be sufficient to carry the debt, (2) two-thirds of both houses of the General Assembly vote to authorize the debt, and (3) the total authorized § 9(c) debt does not exceed 1.15 times the average annual revenues from income and retail sales taxes for the immediately preceding three fiscal years.

The Attorney General does not contend that the proposed highway user revenue bonds would be permissible under § 9(a), (b), or (c), but relies upon § 9(d) for the bonds' validity. Section 9(d) provides as follows:

Obligations to which section not applicable.

The restrictions of this section shall not apply to any obligation incurred by the Commonwealth or any institution, agency, or authority thereof if the full faith and credit of the Commonwealth is not pledged or committed to the payment of such obligation.

The Attorney General argues that subsection (d) "makes it clear that the only debt proscribed by Art. X, § 9 is debt to which the full faith and credit of the Commonwealth is pledged or committed." She asserts, therefore, that the Article X, § 9 debt proscription is "not relevant" because payment of the proposed bonds is secured by the pledge of a "special fund and in no way involves the Commonwealth's full faith and credit."

The Comptroller, on the other hand, asserts that the Attorney General asks us "to find, for the first time, that a purported special fund which calls for the mandatory, irrevocable inclusion of current and future tax revenues in the special fund qualifies as a § 9(d) exception." He contends that "[s]uch a financing scheme cannot be approved under the guise of the special fund doctrine . . . without doing severe damage to the spirit and purpose of the Constitution."

At the outset, we recognize that the General Assembly functions under no specific grant of power, and its powers are broad and plenary. It may enact any law not prohibited by the Federal or Virginia Constitutions. *Trucking Corporation* v. *Commonwealth*, 207 Va. 23, 29, 147 S.E.2d 747, 751-52 (1966); *Harrison* v. *Day*, 200 Va. 764, 770, 107 S.E.2d 594, 598 (1959). Moreover, an act of the General Assembly is presumed to be constitutional, and every reasonable doubt must be resolved in favor of the act's constitutionality. *Almond* v. *Gilmer*, 188 Va. 822, 834, 51 S.E.2d 272, 276 (1949).

The Constitution, however, is the supreme and fundamental law of the Commonwealth; "[i]t is the charter by which our people have consented to be governed." *Coleman* v. *Pross*, 219 Va. 143, 152, 246 S.E.2d 613, 618 (1978). An Act passed by the Gen-

eral Assembly inconsistent with or repugnant to the Constitution is invalid, and it is our duty to declare such an act unconstitutional. *Commonwealth* v. *Nat. Fire Ins. Co.*, 161 Va. 737, 750, 172 S.E. 448, 453 (1934).

We initially enunciated the Special Fund Doctrine in *Gilmer*, a case involving the constitutionality of the first State Revenue Bond Act (the 1940 Act). The bonds in *Gilmer* were to be payable solely from tolls and charges collected from certain highway projects designated in the 1940 Act. The 1940 Act prohibited the Commonwealth from incurring any obligation "to levy or to pledge any form of taxation whatever," for the payment of the bonds. Acts 1940, c. 399. Thus, the bonds could be issued only to finance self-sustaining, specifically designated projects.

We concluded that adopting the Special Fund Doctrine was appropriate because the 1940 Act imposed "no indirect or contingent obligation . . . upon the State to *levy any tax or make any appropriation* toward the enterprise." *Gilmer*, 188 Va. at 840, 51 S.E.2d at 279 (emphasis added). Indeed, we stated that "[t]he source and only source from which the [bondholders] may force payment is fixed, designated and limited. It is that special fund created by those who pay the tolls and charges for the use of the facilities . . . and none other." *Id.* at 842, 51 S.E.2d at 280.

We next considered the application of the Special Fund Doctrine in *Farquhar* v. *Board of Supervisors*, 196 Va. 54, 82 S.E.2d 577 (1954). In *Farquhar*, we upheld the constitutionality of the Virginia Water and Sewer Authorities Act — legislation that permitted the issuance of bonds secured solely by revenues derived from user fees paid to a county. We relied upon our holding in *Gilmer* and distinguished it from *American-LaFrance* v. *Arlington County*, 164 Va. 1, 178 S.E. 783 (1935), explaining that the debt held unconstitutional in *American-LaFrance* was "one running over a period of years and payable from the general tax funds." *Farquhar*, 196 Va. at 61, 82 S.E.2d at 582. We further explained that "[t]he special fund doctrine is not applicable unless the creditor must look for payment to the special fund alone; if the political entity is made generally liable, then an indebtedness is created within the debt limitations of the Constitution." *Id.*

*Harrison* v. *Day*, 202 Va. 967, 121 S.E.2d 615 (1961), required our consideration of the Special Fund Doctrine's applicability to revenue bonds payable solely from revenues derived from newly constructed port facilities. In *Harrison*, the Virginia State Ports

Authority contracted with a railway company to lease properties for the purpose of providing port facilities. The revenue bonds issued to underwrite the project expressly negated any obligation of the Commonwealth to pledge its full faith and credit. In the contract, however, the Virginia State Ports Authority agreed that it would "urgently request" the General Assembly to make annual appropriations for a percentage of the cost of the project. Relying on *Gilmer*, we held that this "moral obligation" on the part of the Commonwealth was not a constitutionally prohibited debt because the state was in no way obligated to make the "urgently request[ed]" appropriations. *Harrison*, 202 Va. at 975-77, 121 S.E.2d at 620-21.

We again considered the Special Fund Doctrine in *Button v. Day*, 204 Va. 270, 130 S.E.2d 459 (1963) (*Button I*). In *Button I*, we addressed the constitutionality of an amendment to the Virginia College Building Authority Act, now Code §§ 23-30.23 through -30.38. The original act authorized certain colleges to issue bonds to finance the construction of various projects. The bonds were to be secured by a pledge of, and payable solely from, the revenues derived from the projects. The amendment considered in *Button I* permitted certain educational institutions to issue bonds secured partly from the increases in revenues from other existing projects. We upheld the constitutionality of that amendment. In so doing, we approved an expansion of the Special Fund Doctrine because the bonds were "payable solely from a special fund[,] . . . the general credit of the State" was not pledged for their payment, and the bondholders could not "look to the State's general revenues for payment." *Button I*, 204 Va. at 273, 130 S.E.2d at 462.

*Button I* was followed by *Button v. Day*, 205 Va. 739, 139 S.E.2d 838 (1965) (*Button II*). In *Button II*, we considered a further amendment to the Virginia College Building Authority Act that made all revenues from other existing facilities available for pledge to or payment of bonds. We also approved this amendment because the legislation provided that the bonds "are payable only from the specified revenue sources and the [bondholders] may not look to the State's general revenue for payment." *Id.* at 743, 139 S.E.2d at 840.

Most recently, we considered the Special Fund Doctrine in *Baliles v. Mazur*, 224 Va. 462, 297 S.E.2d 695 (1982), where we addressed specifically the application of Article X, § 9(d) of the

Constitution. *Baliles* dealt with the Virginia Public Building Authority, a governmental entity created for the purpose of financing the acquisition, construction, maintenance, and operation of the Commonwealth's public buildings. The revenue bonds authorized for this purpose were payable solely from the buildings' operating revenues, which were pledged to secure the bonds. These revenues were to be generated by leasing the buildings to the Commonwealth. The leases, however, could be terminated early in the event funds for rental payments became unavailable through failure of the General Assembly to appropriate the money. The enabling legislation provided that the bonds state on their face that they "shall not constitute a debt of the Commonwealth." *Id.* at 466, 297 S.E.2d at 697.

Although the special fund from which the bonds in *Baliles* were payable was to consist of payments from the Commonwealth's general fund, we held that the Special Fund Doctrine applied because the legislation imposed no *legal* obligation upon the General Assembly to appropriate the funding. *Baliles*, 224 Va. at 471, 297 S.E.2d at 699-700. In holding that the bonds would not constitute a debt of the Commonwealth, we said that "[t]he overriding consideration . . . is whether the legislative body is *obligated* to appropriate the funds, not the source or composition of the special fund." *Id.* at 471, 297 S.E.2d at 700 (emphasis added).

In the present case, the Comptroller supports his contention that the proposed highway user revenue bonds would constitute a debt of the Commonwealth rather than come within the ambit of the Special Fund Doctrine by focusing upon the amendments to Code § 33.1-277. Although both the former and the present Code § 33.1-277 provide that the bonds "shall not be deemed to constitute a debt of the Commonwealth . . . . or a pledge of the faith and credit of the Commonwealth," the 1986 amendment has effectively rendered that provision inapplicable to highway user revenue bonds.

Prior to the 1986 amendment, Code § 33.1-277 contained the following provision:

> The issuance of revenue bonds under the provisions of this article shall not directly or indirectly or contingently obligate the Commonwealth to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment, other than to appropriate available funds derived

as revenues from tolls and charges collected under this article or derived from bond proceeds or earnings thereon and from any other available sources of funds.

In contrast, however, amended Code § 33.1-277 reads as follows:

The issuance of revenue bonds under the provisions of this article shall not directly or indirectly or contingently obligate the Commonwealth to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment, *other than to impose highway user revenues, tolls and appropriate available funds derived as revenues under this article* or derived from bond proceeds or earnings thereon and from any other available sources of funds.

(Emphasis added.)

■ As previously noted, highway user revenues by definition include revenues generated by (1) the increases in motor vehicle fuel taxes, (2) the increase in motor vehicle registration and license plate fees, and (3) the increase in motor vehicle sales and use taxes. Thus, the bonds would be payable in part from and secured in part by the Commonwealth's revenues derived from taxes that the General Assembly is legally obligated to impose and appropriate to the special fund.

The Attorney General nevertheless contends that the pledge of highway user revenues to secure payment of the bonds is constitutional because, historically, such tax revenues have been set aside by statute for highway purposes. She asserts, therefore, that the General Assembly will not be pledging or committing the general credit of the Commonwealth or reducing the Commonwealth's general fund because highway-related taxes were never treated as part of the general fund.

■ Although we recognize that the General Assembly has historically allocated these revenues for highway purposes, we also recognize that these funds are nonetheless tax revenues that a future session of the General Assembly, in its discretion, could allocate for other purposes or even repeal entirely. Moreover, the General Assembly has never pledged or required the appropriation of highway user revenues to secure long-term debts or obliga-

tions.[3] Simply because previous sessions of the General Assembly have treated or labeled these revenues as a "special fund" does not qualify them under the Special Fund Doctrine for the Article X, § 9(d) exception to the constitutional debt limitations. The issue presented is not controlled by how the General Assembly historically has exercised its discretion, but rather by the limitations placed upon the General Assembly by the people through their Constitution.

The Constitution recognizes the element of legislative discretion inherent in highway user taxes. The Constitution provides that if a debt incurred under § 9(b) is "for public road purposes, [the payment of such debt] shall be first made from revenues segregated by law for the construction and maintenance of State highways." However, the Constitution does not define the phrase "revenues segregated by law for the construction and maintenance of State highways," nor does it mandate the segregation of any such revenues. Clearly, the framers intended to leave the determination of which, if any, revenues should be segregated for such purposes to the discretion of each session of the General Assembly, thereby allowing future legislatures the flexibility to meet the Commonwealth's changing needs.

In *Miller, Att. Gen.* v. *Watts, Treas.*, 215 Va. 836, 841, 214 S.E.2d 165, 169 (1975), we summarized the constitutional meaning of the Special Fund Doctrine as follows:

> Under the [Special Fund] Doctrine, no constitutionally prohibited indebtedness is created when bonds issued to finance a particular State capital project are to be paid solely from a special fund derived from the revenues of that project; *when the legislature is not obligated to appropriate funds* for payment of the indebtedness; *and, when the indebtedness is not*

---

[3] For example, former Code § 58.1-2146 (1984 Repl. Vol.) allocated the fuel taxes imposed by Code §§ 58.1-2701, -2105, and -2116 to "the construction, reconstruction or maintenance of . . . state highways . . . including the retirement of revenue bonds," merely *permitting* fuel taxes to be used for bond payments. Former Code § 58.1-2425 allocated the motor vehicle sales and use taxes imposed by Code § 58.1-2402 "for the construction, reconstruction and maintenance of highways and the regulation of traffic thereon and for no other purpose," excluding by implication the use of these taxes for bond purposes. Former Code § 46.1-167 (1986 Repl. Vol.) allocated the registration and license plate fees imposed by Code §§ 46.1-149 and -154 for many different, specifically identified purposes related to highway construction, maintenance and operation, but payment of revenue bonds was not included in the designated expenditures.

*secured by the* general faith, credit and *taxing power of the State.*

(Emphasis added.)

■ We have approved special funds comprised of project-derived revenues in *Gilmer, Farquhar, Button I,* and *Button II.* We also have approved special funds consisting in part of payments from the general fund that the General Assembly is morally obligated to make, *e.g., Baliles,* and *Harrison* v. *Day,* 202 Va. 967, 121 S.E.2d 615 (1961). However, we have never approved a scheme, such as the Act contemplates, in which a special fund for the payment and security of bonds would consist of tax revenues that the General Assembly is legally obligated to pledge, impose, and appropriate. The Constitution does not permit such an extension of the Special Fund Doctrine, and consequently we hold that the Act's financing scheme would create a debt of the Commonwealth in contravention of the proscription of Article X, § 9 of the Constitution.

The second question submitted by the Comptroller is whether the pledge of highway user revenues authorized under the Act constitutes an appropriation in excess of the limitation contained in Article X, § 7 of the Constitution. Article X, § 7, in pertinent part, provides as follows:

All taxes, licenses, and other revenues of the Commonwealth shall be collected by its proper officers and paid into the State treasury. No money shall be paid out of the State treasury except in pursuance of appropriations made by law; and *no such appropriation shall be made which is payable more than two years and six months after the end of the session of the General Assembly at which the law is enacted authorizing the same.*

(Emphasis added.)

The Attorney General contends that the provisions of the Act mandating a *pledge* of highway user revenues does not constitute an appropriation. She asserts that Code § 33.1-277 imposes "an obligation, a legal duty, to appropriate those revenues . . . but such an obligation is not an appropriation of them."

■ If we examined Code § 33.1-277 in a vacuum, we possibly could accept the Attorney General's assertion. As the Comptroller points out, however, the Act must be read and construed in con-

junction with other amendments passed during the 1986 Special Session as part of the transportation legislation. In this regard, the amendments to Code § 58.1-2425 are most significant. Amended Code § 58.1-2425 provides in pertinent part as follows:

> A. All funds collected hereunder by the Commissioner [of the Department of Motor Vehicles] shall be forthwith paid into the state treasury. The revenue so derived . . . is hereby allocated for the construction, reconstruction and maintenance of highways and the regulation of traffic thereon and for no other purpose. However, . . . (iii) effective January 1, 1987, an amount equivalent to the net additional revenues generated by enactments of the 1986 Special Session of the Virginia General Assembly which amended §§ 46.1-149, 46.1-154, 58.1-2401, 58.1-2402 and this section shall be distributed to and paid into the Transportation Trust Fund, and *are hereby appropriated to the Commonwealth Transportation Board* for transportation needs . . . .

Code § 58.1-2425(A) (1987 Cum. Supp.) (emphasis added).

Clearly, Code § 58.1-2425(A) appropriates revenues. The statute is self-executing — no further legislation is needed to effect the will of the General Assembly.

The Attorney General concedes that the length of the proposed bonds would exceed two and one-half years. Thus, we hold that the appropriation of the pledged revenues provided by Code § 58.1-2425(A) exceeds the limitation set forth in Article X, § 7.

The third question the Comptroller presents is whether the Act violates the mandate of Article IV, § 15 of the Constitution that "[a]ny general law shall be subject to amendment or repeal" by the General Assembly. As previously noted, the Act permits the pledge of highway user revenues to secure the bonds, Code § 33.1-277 (1987 Cum. Supp.), and authorizes the Board to contract with bondholders to maintain highway user revenues at agreed-upon minimum levels, subject to approval by the General Assembly, Code § 33.1-285 (1987 Cum. Supp.).

The Constitution vests in the General Assembly the power to repeal or amend legislation. This means that legislation enacted in one session of the General Assembly may be repealed or amended at a subsequent session of the General Assembly. Any legislation that infringes upon the right of subsequent General As-

semblies to repeal or amend legislation is repugnant to Article IV, § 15.

■ Clearly, this is the effect of the Act. Under the Act, the pledge of taxes to secure the bonds would be irrevocable during the life of the bonds. As previously noted, the Act authorizes the Board to contract with bondholders that pledged highway user revenues "will not be reduced" below agreed levels. Code § 33.1-285 (1987 Cum. Supp.). Such a contractual provision would override any attempt by a future session of the General Assembly to reduce or repeal the taxes because provisions in both the Federal and Virginia Constitutions prohibit legislation that impairs the obligation of contracts. U.S. Const. art. I, § 10; Va. Const. art. I, § 11. Thus, no subsequent session of the General Assembly could repeal or lower the pledged taxes.

■ For the foregoing reasons, we hold that the 1986 amendments to the Bond Act violate Article X, §§ 7 and 9, and Article IV, § 15 of the Constitution. Accordingly, the petition for a writ of mandamus will be denied.

*Writ denied.*

THOMAS, J., concurring.

I concur fully with the Court's opinion in this case. I write separately because the experience of our sister state of Washington with regard to a statutory scheme substantially similar to that discussed in the main opinion, is highly instructive but has not been mentioned.

In 1949, the Supreme Court of Washington, in a five to four decision, upheld the constitutionality of a statutory scheme which called, in part, for the payment of certain bonds from a "special fund" made up from excise taxes on cigarettes. Fourteen years later, in 1963, the Washington court, in a unanimous opinion, reversed itself when it became apparent that all of the state's revenue was being carved up into "special funds" to support various bonds. The State of Washington learned the hard way that whenever taxes of any kind are placed into a so-called "special fund," the treasury can be depleted. Thus, through actual experience, our sister state learned the true meaning of creating debt and lending the state's credit.

Following World War II, the State of Washington enacted legislation to pay a bonus to veterans from that war. The statute called for the issuance of bonds. The funds necessary to pay the bonds were to be secured from the existing excise tax on cigarettes and from the imposition of new excise taxes on cigarettes. Suit was brought attacking the legislation as unconstitutional.

The case was styled *Gruen* v. *Tax Commission*, 211 P.2d 651 (Wash. 1949). One basis for challenging the statute was that it violated the state constitutional provision against lending the credit of the state. The court held that the credit of the State had not been lent to the recipients of the bonuses. However, it said nothing about whether the credit of the state had been lent to support the bonds.

The statute was also challenged on the ground that it violated the state constitutional provision against creating debt without following certain procedures set forth in the Constitution. The court held that the bonds did not create a debt within the meaning of the constitution because they were to be paid from a special fund made up of money generated from excise taxes.

In *Gruen*, the dissenters made several key points. Concerning the creation of debt, one dissenter wrote as follows:

[W]hen bonds are to be paid from future taxes irrevocably allocated to that purpose, which taxes could otherwise be devoted by the legislature to any legitimate public use, a debt is created, and it is immaterial whether the taxes are ad valorem or excise.

*Id.* at 695 (Hill, J., dissenting).

Another dissenter pointed out that because the statute required the legislature to agree to impose taxes sufficient to fund the bonds, the power of taxation had been unconstitutionally contracted away. Further, it was pointed out that the pledge to use tax money to pay the bonds effectively lent the state's credit to the bonds.

In 1949, the dissenters were not persuasive. But fourteen years later, in *State* v. *Martin*, 384 P.2d 833 (Wash. 1963), their views carried the day completely. By that time, $660,000,000 in bonds had been authorized; $500,000,000 in bonds had been issued; and only $85,000,000 of the authorized amount had ever been submitted to the people for a vote. The *Martin* court looked back on

*Gruen* and wrote as follows: "the very logic of the holding [in *Gruen*] authorized preemption of portions of the state's general revenues by each succeeding session of the legislature in the form of segregating future sales tax revenues into special funds." *Martin*, 384 P.2d at 837.

The *Martin* court rejected the type of special fund which had been approved in *Gruen*, and which is embodied in the legislation here under review. In *Martin*, the court made this important point:

> If the revenues in [the special fund] derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge, or the operation of the State Liquor Control Board, or from sales or leases of publicly owned lands, any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But *if the state undertakes or agrees to provide any part of the fund* from any general tax, be it excise or ad valorem, *then securities issued upon the credit of the fund are likewise* issued *upon the credit of the state and are* in truth *debts of the state.*

*Martin*, 384 P.2d at 842 (emphasis added). We would be unwise, indeed, if the lessons learned in our sister state were ignored in Virginia.

We have no more solemn duty as the Court of last resort for the Commonwealth than to insure compliance with our Constitution. In the instant case, our decision that the Constitution has been violated is supported by logic, reason, and the lessons of history.

CARRICO, C.J., dissenting.

The majority refuses to apply the Special Fund Doctrine in this case because, it says, the special fund involved here would consist of "tax revenues that the General Assembly is legally obligated to pledge, impose, and appropriate." The majority acknowledges that the Doctrine is not rendered inapplicable by the inclusion of tax revenues appropriated to a fund as a result of a "moral obligation." *See Harrison* v. *Day*, 202 Va. 967, 121 S.E.2d 615 (1961). In my opinion, however, it makes no difference whether the tax revenues involved in this case find their way into a special fund as

the result of a moral obligation or as the result of a legal obligation undertaken by contract. The tax revenues in question traditionally have been considered and treated as special fund revenues, and so long as bondholders may look only to the special fund for payment, the full faith and credit of the Commonwealth are not involved. And, if the full faith and credit of the Commonwealth are not involved, Subsection d of Section 9 of Article X of the Constitution exempts the bonds from constitutional debt restrictions.

The test for determining if particular obligations involve the full faith and credit of the Commonwealth is whether "the obligations are payable only from the specified revenue sources and the holders may not look to the State's general revenue for payment." *Button* v. *Day*, 205 Va. 739, 743, 139 S.E.2d 838, 840 (1965) (*Button II*). Here, the answer is a clear and resounding "no" to the question whether bondholders, in the event the special fund is inadequate to discharge the bonds, may look to the State's general revenue for payment. Unquestionably, bondholders may look only to the special fund.

Code § 33.1-277 expressly states that bonds issued pursuant to the Bond Act shall not be deemed to constitute a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth. As required by the Code section, the bonds themselves must state on their face that the Commonwealth is not obligated to pay the obligations except from the special fund created by the Bond Act and that the faith and credit of the Commonwealth are not pledged to the payment of the bonds. The section further provides that the Commonwealth is not obligated directly, indirectly, or contingently to levy or pledge any form of taxation or to make any appropriation for the payment of bonds other than "to impose highway user revenues, tolls and appropriate available funds," all of which constitute the special fund as the sole source for the payment of bonds.

I would reply in the negative, therefore, to the first question posed by the Comptroller, *viz.*, whether the Bond Act creates a debt to which the Commonwealth's full faith and credit are pledged or committed. I would also reply in the negative to the other questions posed by the Comptroller.

One of these questions involves the two and one-half year limitation imposed on appropriations by Art. X, § 7 of the Constitution. I do not believe that the amendments to Code § 58.1-2425

violate this limitation. While § 58.1-2425(A) states that highway user revenues "are hereby appropriated to the Commonwealth Transportation Board for transportation needs," the language can be construed, as the Attorney General suggests, to mean that the funds were appropriated on a one-time basis from the effective date of the amendments until the next session of the General Assembly, when the appropriation would be included in a regular appropriation act, with the appropriation repeated at each subsequent session. the amendments are presumed to be valid. We can assume, therefore, that the General Assembly enacted the amendments with one eye on Art. X, § 7 of the Constitution and that it intended the appropriation made in Code § 58.1-2425(A) to be effectual for no longer than the Constitution permits.

The remaining question is whether the Bond Act violates the language of Art. IV, § 15 of the Constitution that "[a]ny general law shall be subject to amendment or repeal" by the General Assembly. This constitutional provision, however, must be read in conjunction with Art. I, § 11 of the Virginia Constitution and Art. I, § 10 of the United States Constitution, both of which proscribe the impairment of contracts.

The Bond Act authorizes the Commonwealth to agree with bondholders to maintain at a minimum level the special fund created by the Act. This is a contractual undertaking protected against impairment by both the State and the Federal constitutions and, to this extent, the authority of the General Assembly under Art. IV, § 15 to amend or repeal a general law is restricted.

The manner selected by the General Assembly to finance highway improvements may or may not be the wisest choice. It is not the province of this Court, however, to pass upon the wisdom of the legislation, only its validity. Believing the legislation to be valid, I would grant the writ.